**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CHARLES BATCHELDER COMPANY, INC., Respondent.**

**No. 684, Docket 80–4174.**

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1981.

Decided March 23, 1981.

Richard A. Cohen, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Assoc. Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel, William R. Stewart, Deputy Asst. Gen. Counsel and C. D. DeLoach, Washington, D. C., on brief), for petitioner.

Guy C. Quinlan, New York City (Joan M. Markey and Rogers & Wells, New York City, on brief), for respondent.

Before FEINBERG, Chief Judge, NEWMAN, Circuit Judge, and MISHLER,* District Judge.

MISHLER, District Judge:

The National Labor Relations Board (the "Board") petitions this court pursuant to section 10(e) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(e), for enforcement of its order issued against Charles Batchelder Company, Inc. (the "Company") on June 25, 1980.[1] The sole issue is whether the record contains substantial evidence to support the Board's findings: (1) that the Company violated sections 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1), (3), by discharging one of its employees and by refusing to rehire another and (2) that the Company violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by promising and granting accelerated wage increases to its employees.[2] The Board, adopting in part the recommended order of the Administrative Law Judge (the "ALJ"), directed the Company to cease and desist from certain unfair labor practices and to take affirmative action to remedy its statutory violations. We grant the petition for enforcement only to the extent that the Board's order relates to the Company's promise and grant of accelerated wage increases to its employees.

---

* Honorable Jacob Mishler, United States District Judge, Eastern District of New York, sitting by designation.

1. The decision of the Board is reported at 250 NLRB No. 9 (1980).

2. The provisions of the Act which are pertinent to our review of this unfair labor practice proceeding read as follows:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of [Title 29 of the United States Code];

     *     *     *

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

29 U.S.C. §§ 158(a)(1) and (3).

### FACTS

In April 1978 the Company[3] announced a break with tradition and informed its employees that the annual wage increases which were customarily effected every May 1 would be deferred until September 1978. The employees were advised that the change was being made in order to conform the timing of the wage increases to the Company's new fiscal year end but that the employees would not be penalized as a result since the increases would be retroactive to May 1. Nevertheless, employee objections ensued and employee Steven Carmichael, at the suggestion of fellow employee Edward Fleming, contacted Local 1040 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "Union") on May 8, 1978 and met with a representative that same day.

Within a few hours after Carmichael's meeting with Union representative Edward Iulo, Carmichael met with Fleming and discussed what had transpired. The two agreed to initiate an organizational campaign and vigorously embarked upon that course through their concerted efforts. Between May 9 and May 12 both employees actively promoted the Union through their discussions with fellow employees and their solicitations of authorization cards.[4] In addition to setting up a meeting for the Company employees on May 14 with Union representative Iulo, Carmichael successfully engaged a fellow employee, Tom Elliot, to assist him in posting Union organizational literature in various locations around the shop, including the restrooms, and an area immediately adjacent to their work place.

Two of the unfair labor practice charges arise out of the discharge of Edward Fleming on the afternoon of Friday, May 12, after he threatened a fellow employee, Joseph Emanuelle, who had indicated that he would not attend the union meeting scheduled by Carmichael for the following Sunday. It is undisputed that Fleming responded to Emanuelle's rejection of his personal invitation by blocking his egress, coaxing him to come to the meeting by stating that it was for Emanuelle's own benefit, and threatening him with physical retaliation. As recounted by Emanuelle, Fleming stated that, "If you don't like it I'll take you out in the parking lot and kick your ass . . . ." Emanuelle, who had been on friendly terms with Fleming prior to the May 12 incident, failed to return to his job and immediately reported the incident to shop foreman Plourde. Emanuelle testified that he had been frightened by his encounter with Fleming and this was corroborated by Plourde, who stated that Emanuelle was "shook up . . . pale and scared" at the time he reported the incident.

Plourde reported the incident to Ronald Beilin and Bruce Batchelder.[5] Thereafter, Emanuelle repeated his account of what had just occurred and after hearing his statement Beilin and Plourde discussed Fleming in general. All parties then present were aware of Fleming's union activities. In the course of their conversation Beilin requested that Plourde comment specifically on Fleming's work record. He answered that Fleming was a fair worker but he had some problems with absenteeism. Plourde ultimately recommended discharge and Beilin concurred. After Plourde had

---

**3.** Charles Batchelder Company, Inc. is a Connecticut corporation engaged in the smelting and manufacture of aluminum ingots. It has a work force of approximately 35 employees and its plant is operated during three separate shifts.

**4.** All dates refer to 1978 unless otherwise indicated.

**5.** The management personnel charged with supervising the daily operations at the plant and who were involved in the alleged unfair labor practices are: Ronald Beilin, the vice president

of operations, Armand Plourde, the shop foreman and Bruce Batchelder, son of the president (employed in a supervisory capacity).

Approximately two years prior to the birth of union activity at the Company in 1978, at least one member of management, Bruce Batchelder, had expressed a strong anti-union sentiment to nonsupervisory personnel. When the first overt signs of union activity surfaced on the morning of May 12, Bruce Batchelder called a foreman's meeting "to find out what was going on."

brought a police officer on the scene Fleming was summoned into Plourde's office to render his version of the incident. The focus of the discharge interview concerned his threat against Emanuelle though the issue of Fleming's absenteeism record was also raised. Plourde rejected Fleming's version of the occurrence as did the ALJ,[6] and then advised Fleming that he was discharged. The police officer escorted him off the Company's premises.

Shortly thereafter Carmichael learned of Fleming's discharge and confronted shop foreman Plourde stating, "If Fleming is let go, I am leaving too." Plourde cautioned him that, "If you walk out now don't bother to come back," to which Carmichael acknowledged his understanding and left the plant. However, within one-half hour following his departure from the Company plant Carmichael telephoned Plourde requesting to have his job back and stated, "I want to apologize for my hasty decision, and see if I can come back to work." Plourde answered, "I [must] think about it .... Call me back Monday morning." When they next communicated on Monday morning Plourde stated that Carmichael could not have his job back. It is undisputed that Carmichael quit and was not discharged.[7]

In the wake of these disputes the union meeting which had been scheduled for May 14 went forward as planned. Thereafter,

union activity continued. Fleming and Carmichael filed unfair labor practice charges against the Company on May 22. The Board's consolidated complaint issued on June 30 and stated that the Act had been violated by their discharge in retaliation for their union activity. During the two to three week period following their discharge, Fleming and Carmichael handbilled the Company's plant with the assistance of union agents. Union related activity subsided after this effort and all overt activity ceased by early June.[8]

In mid-June the Company notified all employees that the new wage increases would become effective July 1, rather than September 1 as announced prior to the advent of union activity. The proffered explanation for the implementation of accelerated benefits was that the Company desired to quell employee dissatisfaction arising from the uncertainty concerning the amount of wage increases.

The Board, in agreement with the ALJ, found that the Company violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by promising and granting wage increases to discourage employees from participating in union activity. Accordingly, the Board ordered the Company to cease and desist from promising and granting benefits for the purpose of inducing employees to refrain from engaging in union activity. However, the Board, rejecting a portion of the ALJ's recommendation, found that the Company

6. The ALJ found that "[a]s between Emanuelle and Fleming, the testimony of Emanuelle was the more believable." After examining the record, the Board found no basis for reversing the ALJ's credibility determinations, and in doing so, it recognized the great weight to which such determinations are entitled. *NLRB v. Bausch & Lomb, Inc.*, 526 F.2d 817, 822 (2d Cir. 1975). Accordingly, we also accept this determination by the examiner who heard the testimony.

7. At the hearing before the ALJ, the question of whether Carmichael was discharged or quit was hotly disputed. Carmichael contended that he had departed from the plant after inhaling noxious fumes which were emitted from his furnace i. e., he left work because he had fallen ill. The report by the ALJ stated that there was a sharp conflict in the testimony concerning the circumstances under which Carmichael had

been terminated. At least five persons testified on this subject. After determining that Carmichael was "an unreliable witness, whose testimony was marked by important contradictions and ... a lack of candor," the ALJ found that Carmichael quit in the face of Plourde's warning and had not been discharged.

8. The Company contends that union activity and the union organizational campaign had abated some weeks before "early June." This evaluation of the evidence contained in the record is reasonable, and perhaps, it is the preferable view of the facts. Nevertheless, the inference is available from the record that union activity continued through early June and that finding is supported by substantial evidence.

had violated sections 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1), (3), by discharging Edward Fleming and by refusing to re-employ Steven Carmichael because they engaged in protected union activity. In overturning the decision of the ALJ with respect to these charges, the Board determined that the asserted grounds for the respective discharge and failure to rehire were merely pretextual and that their employment difficulties sprung solely from their pro-union stand. The Board issued the traditional orders which would be expected in light of its findings and further ordered immediate and full reinstatement, retroactive to May 12, of Fleming and Carmichael.

## DISCUSSION

■ In determining whether the findings of the National Labor Relations Board are supported by substantial evidence, a court "may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*'" *NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962) (per curiam), *quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). We have examined the record keeping in mind this well established proposition.

■ Section 8(a)(3) of the Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3).[9] However, even with the protection afforded by the

Act to employees who organize and engage in union activities, an employer, in the pursuit of the right to manage his enterprise, is not left impotent to discipline an employee for misconduct in the course of employment or for other valid reasons.[10] *See e. g., American Ship Building Co. v. NLRB*, 380 U.S. 300, 311, 85 S.Ct. 955, 963-964, 13 L.Ed.2d 855 (1965); *Waterbury Community Antenna, Inc. v. NLRB*, 587 F.2d 90, 96 (2d Cir. 1978); *NLRB v. Advanced Business Forms Corp.*, 474 F.2d 457, 464 (2d Cir. 1973), *citing NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45-46, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937). There are of course restrictions on this power of management and the Board was correct in identifying as the key question for its examination whether the Company's actions were motivated by lawful or unlawful reasons. *See B. G. Costich & Sons, Inc. v. NLRB*, 613 F.2d 450, 454 (2d Cir. 1980).

■ When an employer has both valid and invalid grounds for disciplining an employee, commonly referred to as a "dual motive", any action taken against the affected employee will not constitute an unfair labor practice *unless* it is shown that there is " 'a reasonable basis for inferring that the permissible ground alone would not have led to the discharge, so that it was partially motivated by an impermissible one.' " *Waterbury Community Antenna, Inc. v. NLRB*, 587 F.2d at 98, *quoting NLRB v. Park Edge Sheridan Meats, Inc.*, 341 F.2d 725, 728 (2d Cir. 1965). Under this test "[t]he magnitude of the impermissible ground is immaterial . . . as long as it was the 'but for' cause of the discharge." *Id.* at 98 (citations omitted). With respect to the instant controversy, the Board found that the impermissible ground was the only basis

9. With respect to the employee terminations the complaint also charged, and the Board found, a violation of section 8(a)(1). However, because the alleged violation of that section arises out of the same operative facts that surround the charged section 8(a)(3) violation, the ALJ, the Board, and the petitioner have not treated it discretely, apparently assuming that it stands or falls together with the 8(a)(3) charge. We agree.

10. Further, as stated by Judge Friendly, "[I]f an employee is discharged for neglect or delinquency, there is no violation [of the Act] simply because he was engaged in organizing and the employer sheds no tears at his loss." *NLRB v. Park Edge Sheridan Meats*, 341 F.2d 725, 728 (2d Cir. 1965).

for the Company's action and that the ostensible justifications offered by the Company for the respective discharge and refusal to rehire were merely pretextual.[11] The Board has defined a pretextual justification as follows:

> Examination of the evidence may reveal . . . that the [employer's] asserted justification is a sham in that the purported rule or circumstance advanced by the employer *did not exist, or was not, in fact, relied upon.* When this occurs, the reason advanced by the employer may be termed pretextual. Since no legitimate business justification for the discipline exists, there is, by strict definition, no dual motive.

*Wright Line, A Division of Wright Line, Inc.*, 251 NLRB No. 150 (1980) (emphasis added). Accordingly, in reviewing the Board's findings we need not engage in the "but for" analysis since the question before the Board was not the extent to which the Company relied on valid grounds for its action, but whether the stated grounds were the real ones.[12]

█ Even though the Board accepted the ALJ's credibility findings, it nevertheless overturned the decision of the ALJ and found that Fleming's threat against Emanuelle was not the basis for his discharge. It relied on four facts and circumstances in finding that the discharge was motivated solely by anti-union sentiment. All but the first of these enumerated reasons—the fact that Fleming had been "a long-term satisfactory employee"—are unpersuasive of its conclusion. The Board found that the record was devoid of any indication that Fleming's language was more than a simple angry statement—that his statement was neither intended to be, nor reasonably could have been, interpreted literally. This view is contrary to Emanuelle's credited testimony that he had been frightened by the threat and had a reasonable basis for believing that Fleming would carry it out.[13] 250 NLRB No. 9 at note 1. Further, in discounting the seriousness of Fleming's threat the Board relied on the Company's settlement offer to hire Fleming made six months after his discharge to show that the Company *never* considered him to have violent tendencies. The subsequent offer, of doubtful admissibility as a settlement offer, does not provide a substantial basis for rejecting the bona fide belief six months earlier that Fleming's threat justified his dis-

---

11. The Board's Decision and Order states:

    [W]e must decide whether [the] circumstances support the conclusion urged on us by the General Counsel that Fleming was discharged for unlawful reasons, rather than for the lawful reasons advanced by Respondent.

    \* \* \*

    [W]e find . . . that the reasons given by Respondent for Fleming's discharge were wholly pretextual and that Fleming was in fact discharged for his prounion stand.

    [W]e find the reason given for the refusal to be pretext and that Carmichael was refused reemployment because of his prounion activity.

    250 NLRB No. 9 (1980).

12. Since the "in part" test is no longer the rule in this Circuit, we could not enforce the Board's order merely because we might conclude that the Company's actions were premised upon legal and illegal motivations. Without deciding whether we should apply the "but for" analysis to the record before us when the Board has not made the necessary findings under that test, we note that our conclusions today would remain unaltered if we were to engage in such an analysis.

13. In addition to Emanuelle's testimony that he had been scared by Fleming's threat, the record discloses the following answers given by Emanuelle at the hearing before the ALJ:

    Q. Why [were you scared]?
    A. Well, it's common knowledge at the shop that [Fleming is] an ex-con, and nobody to be messed with.

    \* \* \*

    Q. Did you feel you were going to get hit then and there?
    A. I was expecting it.

    In face of this credited testimony, the Board suggests that the fact that Emanuelle and Fleming had been on friendly terms provides some showing that Emanuelle did not really fear Fleming. On the facts before us, we believe this inference must be disregarded since it is without a rational basis. *See e. g., NLRB v. Local 50, American Bakery & Confectionery Workers Union*, 339 F.2d 324, 328 n.4 (2d Cir. 1964), *cert. denied*, 382 U.S. 827, 86 S.Ct. 62, 15 L.Ed.2d 72 (1965); *NLRB v. Miranda Fuel Co., Inc.*, 326 F.2d 172, 184 (2d Cir. 1963) (Friendly, J., dissenting).

charge. Next, the Board noted that the decision to discharge Fleming was made without affording him an opportunity to present his version of the incident. Under the circumstances, this point warrants no discussion. Finally, the Board also relied on Plourde's reference to Fleming's absenteeism at the discharge interview as evidence of the Company's bad faith since his absentee record was not any worse than other employees who had not been discharged. However, as a matter of credibility, the ALJ found that comment to have been no more than a response to Beilin's inquiry about Fleming's work record and not an independent basis for the discharge. And, the very discussion of Fleming's work record at the management conference prior to management's confrontation with him was relevant to the decision at hand and appropriate. *See Illinois Ruan Transport Corp. v. NLRB,* 404 F.2d 274, 280 (8th Cir. 1968). As stated earlier, only the fact of Fleming's status as a long-term satisfactory employee is persuasive of the Board's conclusion. However, this fact standing alone does not amount to substantial evidence in the face of evidence that the Company has not tolerated similar employee conduct in the past. *NLRB v. Park Edge Sheridan Meats, Inc.,* 341 F.2d at 728 (stating that the General Counsel "will normally lose if the employer can establish a record of discharge for similar conduct").

■ Our view of the record leads us to the conclusion that the Board's characterization of Fleming's threat and its finding that the threat was not the ground for discharge amounts to nothing more than the mere substitution of its hindsight judgment for a decision which is properly vested in management. The Board engaged in mere speculation when it concluded that the proffered ground for discharge was pretextual. Before an undisputed threat of violence to an employee can be written off as pretextual with the consequent impact of depriving the employer of his right of management, more evidence than is before us now must be presented.[14]

■ With respect to the unfair labor practice charge arising out of management's refusal to rehire Carmichael, the record is also devoid of substantial evidence to support the Board's conclusion. It is undisputed that Carmichael quit after learning of Fleming's discharge. He abandoned the Company during mid-shift and in the face of Plourde's cautionary instruction not to quit. In doing so, Carmichael committed a serious breach of his employment obligation—the departure of Carmichael and Fleming, both furnace operators, left the Company with only one of the three furnaces attended by a furnace operator. The ALJ found that the Company's decision was not attributable, even in part, to Carmichael's union activity because the only basis for such an inference arises from his key role in the union organizational campaign. Nevertheless, the Board found that he was denied re-employment for union-related reasons since the announced basis for the Company's refusal to rehire Carmichael was without a rational foundation.[15]

---

**14.** It is interesting to note that Fleming testified that the union representative, Mr. Iulo, had told Carmichael that his signature on the union authorization card would immunize him from discharge. Based upon this representation, Fleming assumed he too acquired immunity by signing the union authorization card.

**15.** The Company contends that the Board unfairly found a different violation than that which was charged in the Board's complaint—refusal to rehire rather than discharge. The transcript of the hearing before the ALJ indicates that the issue as to discharge was hotly contested. On the other hand, only one question at the hearing was directed to why the Company failed to rehire Carmichael. Though

we have not been supplied with a copy of the Board's complaint our reading of the record and the report of the ALJ lead us to believe that the General Counsel raised this charge only after the hearing before the ALJ had been concluded. The single question put to Plourde concerning why Carmichael was not permitted to return to work on May 12, in the context of the lengthy hearing before the ALJ, did not by itself provide adequate notice to the Company that this different charge had been placed in issue.

In part, the Board's decision with respect to Carmichael was based upon the fact that the Company failed to advance any reason for its refusal to re-employ Carmichael. However, by

In arriving at this conclusion, the Board relied on three facts: that Carmichael was a satisfactory employee for many years; that the incident occurred shortly after Carmichael became involved in union activity; and that in the Board's view, Carmichael's indiscretion on May 12 which lasted no longer than one-half hour considered together with his prior resignation in 1976 for which he provided the Company with adequate notice did not render him a useless employee.[16] Based upon the foregoing, the Board found there was no justifiable basis for denying re-employment, and therefore concluded that the articulated basis must have been pretextual. We disagree. Carmichael's misconduct was serious[17] and there is no evidence that the Company ever condoned similar conduct. Nor was the Company's belief that Carmichael's history of quitting rendered him unreliable, and therefore "useless," without a rational foundation. There also is merit in the Company's point that it must have some capacity to back up the authority of its supervisors.

■ Simply stated, the Board has used speculation, rather than substantial evidence, in arriving at its conclusion. The record indicates only a weak showing of union animus at the time Carmichael quit. However, even if the Company had exhibited a somewhat stronger anti-union sentiment, Carmichael's union membership alone does not measure up to substantial evidence in support of the Board's order that Carmichael be reinstated.

■ As to the July 1978 wage increase, even though the question is a close one we believe the Board's conclusion is supported by substantial evidence.[18]

The petition for enforcement is granted in part; the order of the Board is modified by vacating paragraphs 1(a), 2(a), and 2(b) thereof and by appropriately modifying the notice which must be posted.

## NEWMAN, Circuit Judge, concurring:

I concur in all of the conclusions reached in Judge Mishler's thorough opinion for the Court and in virtually all of his opinion, but add these additional views in an attempt to clarify analysis of employer motivation cases under §§ 8(a)(1) and (3) of the Act, especially in the aftermath of the Board's significant opinion in *Wright Line, A Division of Wright Line, Inc.*, 251 NLRB No.

virtue of the allegations in the Board's complaint, *see* Decision of Administrative Law Judge Joel A. Harmatz (June 13, 1979), and by virtue of what was litigated at the hearing before the ALJ, the Company had no reason to offer evidence on this subject. After establishing that Carmichael in fact had quit on May 12 the Company adequately rebutted the charge in the Board's complaint. The prejudice to the Company in the Board's finding of a different violation is obvious. *See Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1335 (7th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978); *Engineers and Fabricators, Inc. v. NLRB*, 376 F.2d 482, 485 (5th Cir. 1967); *Steel-Feb, Inc.*, 212 NLRB No. 41 (1974); *Glasgow Industries, Inc.*, 210 NLRB No. 22 (1974); *see generally*, Bernard Schwartz, *Administrative Law*, §§ 96–97 (1976).

Since we have not been furnished with a copy of the Board's complaint and amendments thereto, if any, we hesitate to deny enforcement on the ground that the Company was not properly apprised of the charge against it. However, it is unnecessary to resolve this point since the Board's order with respect to this charge is otherwise unenforceable for a lack of substantial evidence.

**16.** On examination by the General Counsel, Plourde testified that he rejected Carmichael's request to return to work because his practice of quitting made Carmichael "useless to [him]."

**17.** The Board implicitly finds that Carmichael's conduct was not a serious breach of his employment obligation by stating that he "was denied reemployment for a wholly unsubstantial reason." Its decision rejected the ALJ's explanation of the Company's refusal—that Carmichael's conduct threatened the viability of the Company's operations on May 12—since the Company itself did not offer the explanation in its own behalf. This logic is fatally flawed since it appears that the "refusal to rehire" was not litigated before the ALJ, see note 15, *supra*. Such evidence was not introduced since it was irrelevant to the charged unfair labor practice. Accordingly, the Board should not have discounted the seriousness of Carmichael's conduct to the point of ignoring it.

**18.** See note 8, *supra*.

150 (slip op. Aug. 27, 1980), [1980] Lab.L. Rep. (NLRB Dec.) (CCH) ¶ 17,356.

In *Wright Line*, the Board surveyed the assortment of pronouncements in prior decisions of the Board and the Courts of Appeals and concluded that the correct framework for determination of employer motivation is the model adopted by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Applying *Mt. Healthy* to the context of a § 8(a)(3) claim, the Board announced that the General Counsel must make "a *prima facie* showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." Slip op. at 20–21, [1980] Lab.L.Rep., *supra*, at 32,469. Thus, the Board has rejected all vestiges of the "in part" test of motivation and adopted the "but for" test, with the burden on the employer, after a *prima facie* case is shown, to establish that he would have taken the same action if only the valid ground had existed. If the employer fails to sustain his burden, then it can be concluded that he would not have acted "but for" the protected conduct, and only in that event is such conduct a legally significant cause of the employer's action; if the employer satisfies his burden, then he avoids liability, even though he may in fact have relied "in part" on the protected conduct when he decided to take action.

The Board suggests in *Wright Line* that "an additional benefit which will result from our use of the *Mt. Healthy* test is that the perceived significance in distinguishing between pretext and dual motive cases will be obviated." Slip op. at 20 n.13, [1980] Lab.L.Rep., *supra,* at 32,472 n.13. That suggestion bears examination in this case, because Judge Mishler's opinion analyzes this case as one of pretext, rather than dual motive, thereby implicitly indicating that the distinction serves a useful purpose.

To see why this is so, at least to some extent, requires a clear understanding of the analytical processes involved (1) in examining whether a ground asserted by an employer is a "pretext" and (2) in applying the "but for" test to an employer's dual motivation. Simply stated, "pretext" analysis asks, "What happened?" "But for" analysis asks, "What would have happened?" When we say an asserted ground is a pretext, we mean that we do not believe the employer when he says that he relied upon that ground in taking the challenged action.[1] When we say an employer has not sustained his burden under the "but for" test, we mean that he has not proven that he would have acted the same way if only the valid ground had existed. Of course, "but for" analysis asks the hypothetical question as to what would have happened in order to reach a conclusion as to the legal significance of what did happen, but the fact that both approaches answer the same ultimate legal question should not obscure the different factual inquiries each pursues.

---

1. In the *Wright Line* excerpt quoted by Judge Mishler, *supra* at 39, the Board maintains that the employer's asserted ground is pretextual if the ground either "did not exist, or was not, in fact, relied upon." It is probably not accurate and certainly not helpful to consider as pretextual all situations where the employer asserts a ground that does not in fact exist. "Pretext" analysis focuses on the employer's thought process and inquires whether he is to be believed when he says that he relied on an asserted ground. If the employer believes the employee has committed some act of misconduct, and discharges him based on this belief, then the asserted ground is not a pretext, even if the employee in fact is innocent. Of course, the circumstances would have to provide substantial indication that the employee is not innocent before the employer's belief could be credited. However, where the asserted ground for the employer's action is some rule that does not in fact exist, "pretext" analysis is proper. If an employee is five minutes late and the employer discharges him, claiming he relied on a rule that such tardiness always results in discharge, evidence that such a rule does not exist obviously shows that the one instance of tardiness has been seized upon as a pretext for the discharge. Even in this example, the fact of tardiness exists; what does not exist is any rule concerning such tardiness. To say the fact of the rule does not exist is simply another way of saying the employer is not to be believed when he says he relied on the fact of tardiness.

The Board is correct in suggesting in *Wright Line* that "but for" analysis *can* serve as the sole analytical model, but this does not eliminate the distinction between "but for" and "pretext" analysis. Relying on "but for" analysis subsumes "pretext" analysis within "but for" analysis in some cases and renders it unnecessary in others. In every case, the Board can ask, "Would the employer have taken the same action if only the valid ground had existed?" If the answer is no, the employer loses, and in that event the Board need not determine whether the employer really did rely on the valid ground in the actual case, or whether the employer really would have relied on the valid ground in the hypothetical case where only the valid ground existed. If the answer to the "but for" inquiry is yes, the employer wins, but in order to answer yes, the Board must have concluded that in the hypothetical case where only the valid ground existed, the employer really would have relied on it, and this conclusion will be reached only if the Board concludes that in the actual case the employer really did rely on the valid ground. Thus, to answer the "but for" question in the employer's favor, the Board will have to have made a "pretext" analysis and found in the employer's favor.

Conversely, the Board can start with pretext analysis, in which event it will have to move on to "but for" analysis only in some cases. In every case the Board can ask, "Did the employer really rely on the asserted, valid ground?" If the answer is no, the employer loses, and the Board need never make the hypothetical inquiry necessary for "but for" analysis. If the answer to the "pretext" inquiry is yes, the case is then one of dual motivation, and the Board must then move on to "but for" analysis and ask, "Would the employer have relied on the valid ground if it had been the only existing ground?"

The point is that the *Mt. Healthy* "but for" formula *does not always eliminate* the distinction between "pretext" and "dual motivation" cases. The further point is that analysis of any § 8(a)(3) case can begin with either the "pretext" inquiry as to what actually happened or the "but for" inquiry as to what would have happened. Whichever inquiry is first made, a no answer ends the case, and the employer loses; a yes answer obliges the Board to move on to the other inquiry, or implicitly to have considered it.

Moreover, as this case illustrates, it will sometimes be more sensible for the Board to start with "pretext" analysis. In this case the Board did not ask, "Would the employer have discharged Fleming if the only existing ground had been his threat to Emanuelle?" Instead the Board pursued "pretext" analysis and asked "Did the employer really rely on the threat episode?" The Board answered that question no, and therefore ruled against the employer. By using "pretext" analysis and inquiring as to what actually happened, the Board avoided the need to make the more speculative "but for" analysis and to inquire as to what would have happened if the threat episode had been the only existing ground. Had there been substantial evidence to support the Board's conclusion, "pretext" analysis alone would have sufficed.

An additional complication arises when the Board's decision in a § 8(a)(3) case is reviewed on appeal. In this case, Judge Mishler's opinion for the Court suggests that since the Board used "pretext" analysis, we need not engage in "but for" analysis, *supra* at 39. I can agree that we need not, but I believe we should. Moreover, if contrary to my view, we do not engage in "but for" analysis, then the more appropriate disposition of the appeal would be a remand. To take the second point first, we all agree that the Board made a "pretext" analysis in concluding that the employer did not in fact rely on Fleming's threat when it decided to discharge him. We also all agree that the record lacks substantial evidence to support the Board's conclusion, and we therefore decline to enforce the portion of the Board's order resting on that conclusion. However, if we were to end our consideration at that point, we would, in effect, have decided that the employer really did rely on Fleming's

threat. As discussed previously, this yes answer to the "pretext" inquiry does not end the case; it simply requires moving on to the "but for" analysis, since at this point all we have decided is that the employer had two motives in mind, Fleming's threat and his protected organizing activity.[2] To sustain his discharge, it is necessary to find that the employer would have discharged Fleming if the threat had been the only existing ground. Therefore, if we are not going to make the "but for" analysis, we should remand to the Board to permit it to make that analysis and then review its conclusion to see if it is supported by substantial evidence.

However, I believe it is appropriate and preferable, at least in a case such as this, for the reviewing court to avoid the delay of a remand and move on to "but for" analysis. I think we can safely assume that since the Board concluded from the evidence that the employer did not really rely on Fleming's threat, the Board, if reversed on that conclusion and obliged to move on to "but for" analysis, would inevitably conclude that the employer would not have discharged Fleming if the threat had been the only existing ground. If the Board thought there was no reliance on this ground, it could hardly think there would have been independently sufficient reliance.[3] Having found no substantial evidence to support the Board's "pretext" conclusion, we should therefore assume the Board would also rule against the employer on a "but for" analysis and proceed to consider whether there is substantial evidence for that conclusion. As Judge Mishler's opinion points out, *supra* at 39 n.12, there is not substantial evidence for that conclusion either, and for that reason enforcement of the order concerning Fleming is properly denied, without the need for a remand. The same reasoning applies to the portion of the order concerning the failure to rehire

Carmichael. For these reasons, I join the Court's opinion.

---

**2.** In saying this, I assume we are not prepared to say that the record lacks substantial evidence to support a conclusion that Fleming's protected organizing activity was part of the employer's motivation in discharging him.

**3.** Indeed, in some cases, when the Board applies "pretext" analysis and concludes that the employer did not rely on the asserted ground, it may have intuitively applied "but for" analysis and implicitly concluded that the employer would not have relied on the asserted ground, if it had been the only existing ground.