**NATIONAL LABOR RELATIONS BOARD,**
Petitioner-Cross-Respondent,

v.

**ISLAND TYPOGRAPHERS, INC.,**
Respondent-Cross-Petitioner.

Nos. 368, 681, Dockets 82–4135, 82–4145.

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1982.

Decided April 6, 1983.

---

John D. Burgoyne, Asst. Gen. Counsel, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Abby Simms, N.L.R.B., Washington, D.C., of counsel), for petitioner-cross-respondent.

Henry C. Woicik, New York City (Auerbach, Labes & Woicik, New York City, of counsel), for respondent-cross-petitioner.

Before VAN GRAAFEILAND, MESKILL and PRATT, Circuit Judges.

MESKILL, Circuit Judge:

The National Labor Relations Board (Board), petitions pursuant to section 10(e) of the National Labor Relations Act (NLRA or the Act), 29 U.S.C. § 160(e) (1976), for enforcement of its September 9, 1980 order against the respondent, Island Typographers, Inc. (Island or the company). The Board found that Island had violated section 8(a)(1) and (5) of the Act by unilaterally deciding to replace its "hot type" typesetting operation with a "cold type" method of production,[1] and by furloughing its linotypists without giving the Long Island Typographical Union No. 915, International Typographical Union (Local 915) notice or an opportunity to bargain. See 29 U.S.C. § 158(a)(1), (5) (1976). The Board also found that the company violated section 8(a)(1) and (3) by failing to present proof of a business motivation to justify its decision to lay off union employees while retaining non-union employees. See 29 U.S.C. § 158(a)(1), (3) (1976). Island has cross-petitioned to set aside the Board's order. Based upon our review of the record as a whole, we find that the Board's order is not supported by substantial evidence. Therefore, we deny enforcement. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951); NLRB v. George J. Roberts & Sons, Inc., 451 F.2d 941, 946 (2d Cir.1971).

Island Typographers, Inc. is engaged in the manufacture, sale and distribution of typeset proofs and related products. Since the late 1950s, Island, as a member of a typographical industry employers' association, has had a congenial collective bargaining relationship with Local 915, the union that has represented its journeymen linotypists. Indeed, both Island and Local 915 characterize the history of their collective bargaining relationship as amicable and free from major labor dispute.

Against this backdrop of labor tranquility, representatives from the union and industry met on eight separate occasions during August and September of 1976 to negotiate a new labor agreement. During these sessions, spokesmen for the industry expressed concern over competition from non-union shops that were using a cost-efficient "cold type" process. The employers proposed that they be given the unilateral authority to replace their "hot type" method of production with the new technology. The union took the position that it would meet separately with each employer to discuss the question of technological innova-

---

1. In previous opinions the Board and the courts have often described the "hot type" and "cold type" processes as follows:

This [hot type process] is a fairly complicated method whereby skilled composing room employees cast lines of type in molten lead, assemble those lines by hand into a complete page and send the page on to the pressroom where the pressmen ... make up the press plates which actually print the newspaper.
... "Cold type" is a process by which type is prepared by simply pasting printed material on a mat which in turn is photographed in a manner that transfers the image to a metal plate which when exposed to acid is etched into a finished plate ready for the pressroom. The cold type process eliminates the highly complicated linotype procedure. Consequently, it does not require any of the skilled labor necessary to the hot metal process. NLRB v. Columbia Tribune Publishing Co., 495 F.2d 1384, 1386 (8th Cir.1974); see Newspaper Printing Corp. v. NLRB, 692 F.2d 615 at 616 n. 1 (6th Cir.1982); Omaha Typographical Union, No. 190 v. NLRB, 545 F.2d 1138, 1140 n. 1 (8th Cir.1976); Frye & Smith, Ltd., 151 N.L.R.B. 49, 50 n. 4 (1965); Carl Rochet and Charles Ruud, 136 N.L.R.B. 1294, 1295 (1962).

tion. The final contract did not address this issue.[2]

Although one industry association represented the eight employers during contract negotiations with the union, the industry custom was for each employer to sign the final contract. Therefore, in November of 1976, Mr. O'Brien, vice-president of Local 915, visited Island's plant to obtain its signature on the new collective bargaining agreement. Mr. Bjornsen, Island's president, stated that he could not afford to pay the contractual wage scale and refused to sign.

On November 13, 1976, about the same time as O'Brien's first visit, the company posted a letter advising its employees that non-union employers were increasingly using "cold type" equipment and, to remain competitive in the industry, it would be necessary for Island to acquire similar machinery. After the first "cold type" equipment was delivered the company provided its employees with a set of instructions and allowed them to practice on these machines during company time and on their own time.

Mr. O'Brien returned to Island's plant during March of 1977 in a renewed effort to convince management to sign the contract. Upon arriving at the premises and observing a "cold type" keyboard there, O'Brien again asked Bjornsen to identify the reasons why Island was unwilling to sign the contract. Bjornsen responded that "he couldn't pay the [union] wage scale to people *who were going to be operating a cold type process.*" J.App. at 122, 241 (emphasis added). In fact, according to O'Brien's testimony, Bjornsen feared "a problem could arise in the future and 'he felt that he couldn't sign the contract and then find he couldn't live within the framework of the contract.'" J.App. at 75.

In the summer of 1977, the company hired the first of several "cold typists" to operate the new equipment and continued through 1978 to hire new employees skilled in the use of the "cold type" equipment. Local 915 made no objections or inquiries with respect to the new employees. Moreover, despite the existence of a union shop clause in both the expired and new collective bargaining agreements, Local 915 never demanded that the new employees join the union. Over the same period, Island increased its acquisition of "cold type" machinery. In May of 1977, Bjornsen formally notified the president of Local 915 that Island was planning to rent two more "cold type" keyboards. At no time did Local 915 object to or request bargaining about the increasing use of this new technology.

Actions undertaken by the union during this period do reveal, however, that it was cognizant of the threat posed by the movement to the "cold type" process. In fact, during May of 1977, Local 915, purportedly reflecting its concern about the "cold type" employees, proposed an amendment to the collective bargaining agreement designed to create a new classification known as "computer typist." The union also proposed separate wages, hours and working conditions for the new title. The proposal did not, however, contain any request for bargaining about Island's acquisition of new technology, or about the linotypists' adaptation to the new methods of production.

At about the same time the union transmitted a "revised proposal" to Bjornsen,[3] O'Brien visited the Island plant for the third time. At this meeting he discussed

---

**2.** Although the 1976–79 collective bargaining agreement did not cover the employers' decision to switch to cold type, it addressed the effect of that decision by providing that

[i]n the event of the introduction of any new equipment, machinery or process which replaces or serves as a substitute, for, or evolution of any composing equipment now in use all work within the jurisdiction of the Union will be performed by journeymen and apprentices covered by this Agreement regard-

less of method, equipment or materials used in the performance of the work.

J.App. at 314. Because of this provision, which would bring cold type workers within the union pay scale, Bjornsen refused to sign the contract.

**3.** The ALJ found that the record was "silent as to many of the events surrounding the submission of proposals by the Union." 252 N.L.R.B. at 11 n. 6.

with Bjornsen the "type of equipment . . . in the plant" and "the ability to make adjustments." J.App. at 85. Bjornsen reiterated his position that he could not afford to pay journeymen's wages for work on cold type equipment. The record contains no evidence that Local 915 initiated any further negotiations or requests for bargaining beyond this point.

In September of 1978, Island laid off one journeyman, and subsequently furloughed two additional employees from this job classification. On December 20, 1978, the union filed its first unfair labor practice charge,[4] alleging that Island violated section 8(a)(1) and (5) of the Act by refusing to bargain with the union over the decision and impact of the change in operation from the "hot type" to the "cold type" process, and 8(a)(1) and (3) of the Act by laying off three journeymen because of their union membership. See 29 U.S.C. § 158(a)(1), (3), (5) (1976). On June 6, 1979, the union filed a second charge alleging that Island furloughed two more journeymen because of their union membership.

The Board adopted most of the ALJ's findings that Island's actions constituted unfair labor practices,[5] but modified her order in light of the finding that the company had not been shown to have "a proclivity to violate the Act." *Island Typographers, Inc.,* 252 N.L.R.B. 9, 9 n. 3 (1980). Despite this qualified finding, the Board ordered Island to (1) bargain upon request concerning its decision to eliminate the hot type operation and to lay off union employees, and (2) offer immediate and full reinstatement to its furloughed employees while making them whole for past loss of earnings.

*Section 8(a)(5)*

■ Under section 8(a)(5) of the Act, it is an unfair labor practice for an employer to refuse to bargain collectively with the representative of his employees. See 29 U.S.C. § 158(a)(5) (1976). The duty to bargain is defined by section 8(d) of the Act as the duty "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d) (1976). If an employer, while engaged in negotiation with the union, unilaterally changes the "conditions of employment," he violates his statutory duty to bargain in good faith. *See NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); *see also NLRB v. Consolidated Rendering Co.,* 386 F.2d 699, 704 (2d Cir.1967). In this case, the Board found that Island violated section 8(a)(5) by unilaterally deciding to update the plant's technology and by laying off union employees as a consequence of that decision.

■ Even if we were to agree that Island unilaterally changed the "conditions of employment," we need not necessarily find a violation of section 8(a)(5). An employer cannot be held liable for his failure to bargain over changes in "conditions of employment" if "the union has made a 'clear and unmistakable waiver' of its right to bargain on the issue." *Soule Glass and Glazing Co. v. NLRB,* 652 F.2d 1055, 1084 (1st Cir.1981) (citing *Metromedia, Inc., KMBC–TV v. NLRB,* 586 F.2d 1182, 1189 (8th Cir.1978); R. Gorman, Labor Law 466–69 (1976)). On this record it is clear that Local 915 waived both its right to object to Island's decision to adopt the new technology and its right to bargain over the effects of this change on the employees.

4. On December 6 the union's president sent a letter to Island complaining about the failure to sign the contract, the laying off of linotypists, and the inability to reach an "agreement to cover the non-union help working within the jurisdiction of the Union." J.App. at 345. The Board adopted the finding of the ALJ that this letter contained no request for bargaining. J.App. at 13, 22–23.

5. The ALJ found that by acceding to Island's payment of differing wages to linotypists and cold typists, the union abandoned its right to represent the cold type employees. The Board reversed this finding and stated that the facts do not support the conclusion that "the Union effectively abandoned its claims to represent the newly hired coldtype employees." 252 N.L.R.B. at 9 n. 1.

### A. Notice

A union cannot be held to have waived its right to bargain over a change in working conditions unless it has received timely notice of the employer's proposed change. *See Soule Glass and Glazing Co. v. NLRB*, 652 F.2d at 1084; *International Ladies' Garment Workers Union, AFL–CIO v. NLRB*, 463 F.2d 907, 918–19 (D.C.Cir.1972). Here the Board found that Island sufficiently notified Local 915 of its initial introduction of "cold type" machinery into the plant, but violated section 8(a)(5) by failing to *further notify* the union of its intention to abandon the "hot type" process and lay off unit employees. We do not agree.

Between 1976 and 1977, Island made no secret of its financial hardship and inability to continue paying high wages to "hot type" linotypists.[6] At the hearing before the ALJ, Mr. O'Brien testified that Local 915 was fully aware of Island's concerns: "We understand our employers' position— it's a battle of survival." J.App. at 148. In order to compete more successfully with non-union shops using the "cold type" process, Island had but one choice, namely, to acquire this new cost-efficient technology. Consistent with this strategy, the company posted a notice in November of 1976 informing its employees that Island would be acquiring a "cold type" machine. J.App. at 337.

This Court has recognized that plant gossip, "conjecture or rumor is not an adequate substitute for an employer's formal notice to a union of a vital change in working conditions . . . ." *NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170, 176 (2d Cir.1961). Here the employer did not rely on innuendo to inform union employees that management intended to rely increasingly on "cold type" machinery. Rather, in November of 1976, Bjornsen posted documents on Island's premises to afford the union notice of management's plan. In May of 1977, Bjornsen notified the president of Local 915 that Island had decided to rent two more cold type keyboards. 252 N.L.R.B. at 12. We find that these actions constituted sufficiently formal notice to apprise the union of the imminent change in the method of production. *See generally NLRB v. Spun-Jee Corp.*, 385 F.2d 379, 383 (2d Cir.1967); *LaClede Gas Co.*, 171 N.L.R.B. 1392, 1394 (1968) ("[W]e need not search for a best way for the Company to have submitted a notice.").

In 1977 Island increased its acquisition of cold type machinery and commenced hiring new employees skilled in its operation.[7] Throughout this period, Island unequivocally stated that it could not afford to pay a linotypist wage scale "to people who [are] going to be operating a cold type process." J.App. at 122. Consequently, it must have become apparent to Local 915 that competitive pressures were forcing Island to depend increasingly on "cold type" typesetting.

In finding that Island violated section 8(a)(5), the Board simply assumed that the union did not understand the implications of Island's increasing reliance on the new technology. Such a finding is naive at best. In the last thirty years the typographical industry has witnessed a rapid increase in technological innovation. Both the courts and the Board regard as common knowledge the fact that employers have achieved substantial cost savings by replacing labor intensive methods of "hot type" linotyping

---

**6.** At the hearing before the ALJ, Mr. O'Brien testified that:

> [T]he competition between the union plants and the non-union plants was very strenuously [sic] and encompassed the majority of the time we negotiated.
>
> . . . .
>
> The employers say that the non-union competition [by using the cold type process] was working for far less rate of wages than our people were . . . .

J.App. at 106, 110. The ALJ found that "[t]he evidence clearly shows that Bjornsen maintained throughout the period beginning with the introduction of the first cold type machine that he would be unable to pay the contractually mandated wages for work on the cold type process." 252 N.L.R.B. at 12.

**7.** The ALJ, as affirmed by the Board, found that: "The record does not show how many new employees were hired, nor does it specify their dates of hiring or rates of pay." 252 N.L.R.B. at 12 n. 8.

with mechanized "cold type" processes. *See Newspaper Printing Corp. v. NLRB,* 692 F.2d at 616–617 (6th Cir.1982); *NLRB v. Columbia Tribune Publishing Co.,* 495 F.2d 1384, 1386 (8th Cir.1974); *Carl Rochet and Charles Ruud,* 136 N.L.R.B. 1294, 1295–97 (1962). Given this well-known trend, together with Island's persistent protestations of economic hardship and clear intention to incorporate cold type machinery into its productive process, the union must have recognized the inevitable mechanization of the shop. We believe that Island's statements and actions sufficed to notify Local 915 of the new changes in method of production and their impact on union employees.

### B. *Waiver*

■ After concluding that the union had formal notice of Island's plans to replace "hot type" methods and personnel with the "cold type" processes, we now turn to the question of waiver. The employer's duty to bargain over the updating of its plant encompasses two distinct issues: (1) the duty to bargain over the *decision* to adopt the new technology, and (2) the duty to bargain over the *impact* of that decision on union members.[8] The Board found that Island violated both duties "by its unilateral action in deciding to terminate the hot type method of production and by its unilateral action in laying off its hot type employees." 252 N.L.R.B. at 15. We believe the evidence in the record as a whole shows that the union "clearly and unmistakably" waived both bargaining rights.

Between 1976 and 1978, Local 915 never requested that Island bargain over its decision to introduce new cold type machinery into the plant or over the increasing importance of this technology in the production process. Indeed, as early as 1976, the union clearly expressed its indifference to the employer's desire to adopt "cold type" machinery. Mr. O'Brien testified that during the 1976 negotiations he had told the employers that they could "[p]ut any equipment you want in .... We don't care.". J.App. at 102. Furthermore, in order to assuage the

---

**8.** The courts have drawn a distinction between the employer's duty to bargain over a particular business *decision* that affects unit employees and the duty to bargain over the *decision's effects* on unit employees. *See Soule Glass and Glazing Co. v. NLRB,* 652 F.2d 1055, 1084 (1st Cir.1981). Although the courts have generally held that the effect of technological innovation on employees is a mandatory subject of bargaining, *see Omaha Typographical Union, No. 190 v. NLRB,* 545 F.2d 1138, 1141 (8th Cir.1976), they have not yet decided the appropriate treatment to accord the employer's decision to innovate. *See First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 686 n. 22, 101 S.Ct. 2573, 2584 n. 22, 69 L.Ed.2d 318 (1981).

At oral argument the Court, *sua sponte,* raised the question of whether the Supreme Court's recent decision in *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), provides the standard for measuring Island's duty to bargain under section 8(a)(5) of the National Labor Relations Act. In *First National Maintenance,* the Court held that an employer has no legal duty under section 8(a)(5) to bargain with the union over the decision to partially terminate its business but must bargain over the effects of such a decision on the employees' job security. In writing for the majority, Justice Blackmun underscored a particular type of managerial decision: "This decision, involving a change in the scope and direction of the enterprise, is akin to the decision whether to be in business at all, 'not in [itself] primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment.'" *Id.* at 677, 101 S.Ct. at 2580 (quoting *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 223, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964) (Stewart, *J.,* concurring)). The Court devised a balancing test for dealing with this type of managerial decision: "[I]n view of an employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." *Id.* at 679, 101 S.Ct. at 2581.

In this case, Island's decision to update the plant's technology fits within Justice Blackmun's special category of managerial decisions. Thus, ordinarily this Court would rely on the balancing test to determine whether Island violated section 8(a)(5) of the Act. However, as we conclude that the union waived its right to bargain over the decision to update this plant, we need not engage in the *First National Maintenance* analysis.

employer's anxiety over competitive pressures in the industry, Mr. O'Brien stated, "[d]on't worry about it. If any of you folks want to go to the cold type process, we'll modify the contract with you on an individual basis." J.App. at 110. These statements are susceptible to only one reasonable interpretation. The union waived its right to bargain over Island's decision to modernize its plant through the introduction of "cold type" machinery.

Moreover, by failing to request bargaining over the impact of this change, Local 915 waived its right to bargain over Island's decision to furlough "hot type" employees. Both the Board and this Court have recognized that a union cannot simply ignore its responsibility to initiate bargaining over subjects of concern and thereafter accuse the employer of violating its statutory duty to bargain. See NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 297, 59 S.Ct. 501, 504, 83 L.Ed. 660 (1939); International Offset Corp., 210 N.L.R.B. 854, 855 (1974); American Buslines, Inc., 164 N.L.R.B. 1055, 1055–56 (1967); see also NLRB v. Spun-Jee Corp., 385 F.2d 379, 384 (2d Cir. 1967).

In International Offset Corp., 210 N.L.R.B. 854 (1974), the Board stated that even though the union knew or should have known that a shutdown was imminent, there was no evidence that the union either requested or proposed to bargain over the effects on employees. The Board held that the union's failure to seek bargaining over the decision and effects on the employees foreclosed a finding of a section 8(a)(5) violation. The Board stated, "[a]s neither Local 119 nor Local 1 requested bargaining, [the Company's] willingness to bargain has never been tested and, having never been tested, [the Company's] conduct may not be found violative of the Act." Id. at 855 (footnotes omitted); see also U.S. Lingerie Corp., 170 N.L.R.B. 750, 751–52 (1968).

This Court reached a similar conclusion in NLRB v. Spun-Jee Corp., 385 F.2d 379 (2d Cir.1967), holding that the union's failure to request bargaining over "the cessation of operations, removal, partial shutdown, sub-contracting, effects of discontinuance and the transfer of employees constituted a waiver of any rights it may have had." Id. at 384 (citing NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 63 L.Ed. 660 (1939); NLRB v. Rural Electric Co., 296 F.2d 523 (10th Cir.1961)).

In this case the union knew as early as the summer of 1977 that Island was replacing its hot type linotyping method of production and hiring skilled cold typists to effectuate the change. Local 915 never requested that Island bargain over this significant change in personnel and method of operation. Rather, in May of 1977, the union initiated negotiations that focused solely on the terms and conditions of the new "cold typists'" employment. These talks, which ended without agreement in June of 1977, constituted the union's only attempt to bargain over the impact of the switch to the cold type method of production.

If the union officers found Island's technological changes to be unacceptable, it was incumbent on them to act diligently to enforce their bargaining rights. Local 915 was fully aware that the employer intended to hire "cold type" employees by the summer of 1977. Despite this knowledge, the union never requested bargaining about the impact of management's decision until December of 1978, when it filed charges against Island. Given this unexplained lapse, we hold that the union waived its right to bargain over the effects of the change in the method of production.

*Section 8(a)(3)*

In addition to section 8(a)(5), the Board found that Island's acts violated section 8(a)(3) of the Act. This section provides in pertinent part:

(a) It shall be an unfair labor practice for an employer—

. . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

29 U.S.C. § 158(a)(3) (1976). To find a violation of section 8(a)(3), the courts have required a showing that the employer's conduct was motivated by anti-union animus. *See American Ship Building Co. v. NLRB,* 380 U.S. 300, 311, 85 S.Ct. 955, 963, 13 L.Ed.2d 855 (1965); *B.G. Costich & Sons, Inc. v. NLRB,* 613 F.2d 450, 454 (2d Cir. 1980). Here, the Board inferred the requisite anti-union animus from Island's failure to provide proof of a business motive for the firing of union employees while retaining nonunion employees.

■ We believe the Board's inquiry into motivation was premature. As the Supreme Court stated in *Radio Officers' Union v. NLRB,* 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954):

> The language of § 8(a)(3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage [union] membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; *only such discrimination as encourages or discourages membership in a labor organization is proscribed.*

*Id.* at 42–43, 74 S.Ct. at 336–337 (emphasis added); *see also NLRB v. Milk Drivers & Dairy Employees, Local 338,* 531 F.2d 1162, 1166 (2d Cir.1976) ("[U]nder § 8(a)(3) . . . [dis]couragement of membership is a *sine qua non* of a violation."). Moreover, this Court has expressly stated that "it is patent that no inquiry into motivation is necessary unless that conduct is first found to have encouraged or discouraged union membership." *B.G. Costich & Sons, Inc. v. NLRB,* 613 F.2d at 455 (citing *Radio Officers' Union v. NLRB,* 347 U.S. at 45, 74 S.Ct. at 338).

The record indicates that it was the union's failure to organize the "cold type"

employees that "discouraged" union membership, *not* the employer's change in its method of production. Both the expired 1973–76 collective bargaining agreement and the proposed 1976–79 agreement contained "union shop" clauses which provided that:

> All present employees who are not members of the local Union . . . shall on and after the 31st day following the beginning of their employment or on and after the 31st day following the effective or execution date of this Agreement, whichever is the later, shall become and remain members in good standing of the local Union as a condition of employment.

J.App. at 301, 332. Consequently, in the summer of 1977, when the cold typists were first hired, the union could have mandated that they join the union. However, Local 915 made no attempt to invoke the union shop agreement. Instead, the union waited for approximately one year and then merely "suggested" that the employees voluntarily join the union. At that time, the union vice-president approached three cold typists and invited them to sign "authorization cards" designating Local 915 as their collective bargaining representative. The employees declined the invitation. The record contains no evidence of any subsequent attempts by the union to include the cold type employees among the ranks of its active members. Given the union's wholesale failure to invoke the union shop clauses, Local 915 cannot now place the blame on the employer as the party responsible for discouraging union membership. It is clear from this record that journeymen were furloughed for a business motive, namely because they were "hot type" operators, not because they were union members.

Moreover, after reviewing this record, we find no substantial evidence of anti-union animus sufficient to support a finding of a section 8(a)(3) violation.[9] The Board ex-

---

9. In citing the Supreme Court's decision in *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the Board contends that no proof of anti-union motivation is needed to find a section 8(a)(3) viola-

tion "if it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights." 388 U.S. at 34, 87 S.Ct. at 1797. Here, the Board concluded that Island's "inherently

pressly found that "it has not been shown that the Respondent has a proclivity to violate the Act or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for employees' fundamental statutory rights." 252 N.L.R.B. at 9 n. 3. The employer's actions here are consistent with this general pattern; the record shows that Island's decision to shift its mode of production to the "cold type" process was motivated by economic necessity, not by anti-union animus. There is not substantial evidence in the record as a whole to support the Board's finding that Island violated section 8(a)(3).[10]

Accordingly, we deny enforcement of the Board's order.

destructive" conduct could be inferred from its failure to show a business motive for the firing of union linotypists while retaining non-union cold typists. We disagree.

This Court has often recognized that section 8(a)(3) is not violated if the employer can show that legitimate business considerations motivated its "discriminatory" actions. *See NLRB v. Charles Batchelder Co.,* 646 F.2d 33, 38–39 (2d Cir.1981); *NLRB v. Bausch & Lomb, Inc.,* 526 F.2d 817, 821 (2d Cir.1975). We believe the record contains abundant evidence that the competitive pressure of the typographical industry forced Island to rely exclusively on "cold type" machinery and therefore to employ only "cold type" operators. *See supra,* section A & n. 5.

10. In finding violations of sections 8(a)(3) and (5), the Board also found concomitant violations of section 8(a)(1). As the parties have not independently argued the 8(a)(1) violations, we conclude that these charges must depend on our resolution of the other unfair labor practice issues. *See NLRB v. Charles Batchelder Co.,* 646 F.2d 33, 38 n. 9 (2d Cir.1981). Consequently, as we believe no substantial evidence supports a finding of Island's violation of sections 8(a)(3) and (5), we find likewise as to section 8(a)(1).