**W.W. GRAINGER, INC.,**
**Petitioner–Appellant,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Appellee.**

Nos. 87–3012, 88–1096.

United States Court of Appeals,
Seventh Circuit.

Argued June 2, 1988.

Decided Oct. 12, 1988.

As Amended Oct. 26, 1988.

Harry Sangerman, McDermott Will & Emery, Chicago, Ill., for petitioner-appellant.

Steven Goldstein, N.L.R.B., Washington, D.C., for respondent-appellee.

Before POSNER, COFFEY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Petitioner W.W. Grainger, Inc. seeks review of an order by the National Labor Relations Board ("Board") finding it in violation of § 8(a)(5) and § 8(a)(1) of the National Labor Relations Act ("NLRA"). The Board, in turn, cross-petitions for enforcement of its order directing Grainger to bargain with Teamsters Local 710. Because we find that Local 710 waived its bargaining rights by repeatedly failing to assert them against Grainger, we decline to enforce the Board's order.

W.W. Grainger, Inc. is a wholesale distributor of industrial products and equipment. It uses various means of transporting its products to retail outlets including trucks. Although Grainger owns a fleet of tractors, it leased trailers and drivers. The drivers' services are leased from driver leasing companies.

In 1974, Grainger entered into a driver leasing contract with Rentar, Inc., which provided Grainger with the services of twenty drivers. By leasing its drivers from Rentar, Grainger hoped to avoid the complexities of the trucking industry which is both heavily regulated and subject to extensive labor agreements between trucking firms and the Teamsters. Indeed, Rentar was a signatory to a labor agreement with Teamsters Local 710, which represented all 20 drivers eventually assigned to Grainger.

Over the course of the six years Grainger had a contract with Rentar, Grainger became increasingly dissatisfied with Rentar's service, in part because Rentar was not controlling the drivers' methods of reporting mileage and thus not controlling Grainger's costs. In other words, drivers were overinflating mileage reports to earn more pay.[1] Since Rentar's commission was also based on the drivers' mileage, it had no incentive to correct the problem.

In 1979, Grainger asked Rentar to impose a uniform mileage system whereby the amount charged for a trip between two points would always be the same. When Rentar appeared unwilling or unable to implement such a system, Grainger informed Rentar it was considering terminating the contract. Rentar then took Grainger's request to the drivers in early 1980, and told them that the Grainger contract would be cancelled if no uniform system was adopted. The drivers responded by suggesting a trade-off. In return for a uniform mileage system, the drivers requested compensation for "branch time"—non-driving time spent at either Grainger distribution points or at retail destinations. Grainger refused to compensate drivers for branch time and avoided doing so by telling the drivers to go off-duty.

When Grainger refused to consider the suggested trade-off, the drivers attempted to formulate a compromise, by accepting the uniform mileage system in return for compensation for any branch time over four hours.[2] However, not all drivers approved this proposal and it ultimately failed. Two of the drivers assigned to Grainger then contacted Local 710 to ask whether they were entitled to compensation for branch time. Local 710 assured the drivers that they were entitled to compensation and called Rentar to ascertain that Rentar would pay. When Rentar failed to respond, Local 710 again called and threatened to grieve against Rentar under their collective bargaining agreement.

At this point, Rentar informed the union that Grainger would not pay for any branch time. Local 710 retorted that its

---

1. Under its contract with Rentar, Grainger had agreed to pay for all direct employment costs, which consisted of mileage and an hourly rate for non-driving time.

2. Local 710 told the drivers to represent themselves on the trade-off and gave them authority to draw up a compromise as long as all twenty drivers approved.

contract was with Rentar not Grainger, and that Rentar would have to abide by the bargaining agreement. Rentar next suggested to the union that another compromise be offered to Grainger, but hastened to add that it stood a good chance of losing the Grainger contract if the drivers continued to insist on payment for branch time.

Matters came to a head when, on March 4, 1980, a driver requested payment for Grainger branch time from Rentar. A grievance was filed and the arbitrator found Rentar liable for the branch time because the driver had never been told to go off-duty. Treating this as a sign that they were all entitled to compensation for branch time, all the other drivers assigned to Grainger also requested payment for their branch time from Rentar. Rentar agreed to pay the drivers but was unable to get reimbursement from Grainger. In May, 1980, Rentar informed Grainger that Grainger could no longer tell drivers to go off-duty and that Grainger would have to pay for branch time.

The drivers, Rentar, and Grainger eventually reached an impasse. At that point, Grainger approached another driver leasing company, TDI, which offered to provide drivers to Grainger on more reasonable terms.[3] Having received signals from Grainger that Grainger was considering doing business with TDI, the president of TDI contacted Local 710 in the middle of May, 1980, and indicated that it was in a position to take over the Grainger account. The union agreed to meet with TDI. On May 26, 1980, shortly before the meeting took place, Grainger gave Rentar notice of cancellation pursuant to a 30–day notice provision in the contract. Rentar, in turn, immediately notified Local 710.

TDI then approached the soon-to-be unemployed Rentar drivers and explained that if they were willing to accept partial payment for branch time, they could contin-

ue driving for Grainger but through TDI. Although the drivers at first agreed to a compromise, which called for a partial payment of branch time, they eventually reneged on their agreement.

Local 710 then filed a grievance against Grainger, Rentar, and TDI individually and in their capacity as co-employers, alleging that they had threatened Rentar employees in violation of § 8(a)(1) of the NLRA, laid-off and refused to reinstate employees in violation of §§ 8(a)(1) and (3), and failed to bargain with the union over the cancellation of the Rentar contract in violation of §§ 8(a)(1) and (5).

Following an extensive administrative proceeding, the Administrative Law Judge ("ALJ") determined that Grainger and Rentar were not co-employers because they did not share substantial control over the drivers. The ALJ found that Grainger therefore was not required to negotiate with Local 710 before cancelling its contract with Rentar. Even if Grainger could have been considered a co-employer with Rentar, the ALJ found that Grainger had no duty to negotiate with Local 710 because the decision to cancel the contract with Rentar was not related to labor costs but rather to Rentar's poor managerial performance. Finally, the ALJ found the union had, in any event, waived any bargaining rights it might have had since it never once asked Grainger to bargain about any of the issues underlying the cancellation of the contract with Rentar. The ALJ therefore dismissed Local 710's grievance in its entirety.

The ALJ's findings were appealed to the Board. Although the Board acknowledged that it was required to accord the ALJ's factual determinations due deference, it gave those findings a different interpretation with respect to whether Grainger was required to bargain with Local 710.[4] The Board ruled that Grainger exercised sufficient control over the drivers to be con-

---

**3.** Much to its surprise, Grainger learned, for the first time, that Rentar's agreement with Local 710 contained a uniform mileage system and that there had never been a need to negotiate on this point.

**4.** The Board did affirm the ALJ on all other claims. Thus, the only issue which remained both for the Board and this court is whether Grainger improperly failed to notify and bargain with Local 710 about the cancellation of the Rentar contract in violation of §§ 8(a)(5) and 8(a)(1) of the NLRA.

sidered a co-employer. Additionally, the Board found Grainger had a duty to negotiate about the cancellation of the Rentar contract since the dispute, underlying that cancellation, centered on labor costs. The Board concluded that Local 710 had not waived its bargaining rights because when Grainger announced its cancellation of the contract, the matter was already a foregone conclusion and any request to bargain would have been futile. The Board then ordered Grainger to bargain with the union and to cease interfering with the union.

Grainger argues the Board erroneously disregarded the ALJ's factual determinations in reaching the conclusion that Grainger was a co-employer with Rentar. The ALJ found that to the extent Grainger exercised control over the Rentar drivers, it was required to do so under federal law. Most of the non-statutory control remained with Rentar. Thus, Grainger and Rentar could not be considered co-employers.

The Board points out that it is entitled to draw its own legal conclusions from the ALJ's factual findings and that its conclusions must be accorded deference as long as they are rationally related to the facts. According to the Board, there are more than sufficient facts to support its determination that Grainger and TDI exercised joint control over the drivers and are therefore joint employers.

Whether two separate entities exert sufficient control over one group of employees to be treated as joint employers for purposes of the NLRA, is a factual question depending largely on such factors as the supervision of the employees' day-to-day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions. *Boire v. Greyhound* Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); *NLRB v. Browning–Ferris Indus.*, 691 F.2d 1117, 1121–23 (3d Cir.1982). Whether two entities are joint employers depends on whether the employer claimed to be a joint employer, "possessed sufficient control over the work of the employees to qualify as a joint employer with [the actual employer]."

*Cf. Boire*, 376 U.S. at 481, 84 S.Ct. at 899. Because the issue of joint employer status is a factual determination, the Board's decision that two employers are joint employers is entitled to deference if supported by the record as a whole. *NLRB v. Western Temporary Services, Inc.*, 821 F.2d 1258, 1266 (7th Cir.1987). In reviewing the inferences drawn by the Board from the evidence as a whole, we need only determine whether those inferences are reasonable "even where a plenary review of the record might yield a different result." *NLRB v. Dorothy Shamrock Coal Co.*, 833 F.2d 1263, 1265 (7th Cir.1987). This standard of review applies even where the Board reaches a different result from that reached by the ALJ. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951).

■ We believe that the record supports the Board's inference that Grainger exercised sufficient control over Rentar's drivers to be considered their joint employer. In its opinion, the Board set forth extensive evidence in support of its determination including the fact that Grainger exercised control over the terms and conditions of the drivers' employment, retained the right to refuse to employ a driver, and retained the right to control the drivers' compensation. In addition, our review of the driver leasing contract between Grainger and Rentar, reveals that the contract vests both parties with dual control over the drivers. We therefore find the Board's ruling is not unreasonable, and though we might have decided the issue differently had we been the trier of fact, we will not disturb the Board's finding on appeal.

■ Grainger next argues that even if it is a joint employer and as a consequence, was required to bargain with Local 710, it was only required to bargain about "labor costs" and not matters which relate to "a change in the nature or direction of the business." Since the decision to terminate the contract with Rentar was purely a managerial decision, it was a decision concerning the nature of the business and not a decision about labor costs.

The Board, on the other hand, contends that the underlying dispute, leading to the cancellation of the Rentar contract, involved the cost of branch time and mileage. While Rentar's control of the drivers' mileage may have been poor, making the decision to terminate Rentar somewhat managerial in nature, Grainger never actually threatened to cancel the contract until the issue of branch time surfaced. Since that issue was directly related to labor costs, the Board found that cancellation of the Rentar contract was a matter about which Grainger was required to bargain.

In *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 215, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964), the Court ruled where a decision by an employer did not alter [the employer's] basic operation but merely replaced existing employees with those of an independent contractor to do the same work, the employer was required to bargain about its decision to subcontract unit work. The Court's ruling in *Fibreboard* was applied by the Board in *Otis Elevator Co.*, 269 NLRB 891, 893 (1984) in which the Board held that where a decision turns upon labor costs, the employer was obligated to bargain. Only where the decision turns upon a change in the nature or direction of the business, was management free to act independently.

Here too, we agree with the Board. Whether a matter is subject to mandatory bargaining because it is a "term or condition" of employment is within the particular expertise of the Board and must be accorded due deference. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979). The Board found that the final event which caused Grainger to terminate its contract with Rentar was the controversy surrounding the cost of branch time. This issue certainly appears to involve a direct labor cost. Moreover, the evidence showed that even after Grainger ceased doing business with Rentar, branch time continued to be of concern to Grainger and TDI. After TDI took over the driver leasing contract from Rentar, it entered into negotiations with the drivers concerning branch time. This would indicate that TDI was just a substitute for Rentar. Under the Supreme Court's decision in *Fibreboard*, Grainger was required to bargain about that substitution. We agree with the Board that these facts indicate that branch time related directly to labor costs and did not relate to Grainger's dissatisfaction with Rentar's managerial skills. Cancellation of the Rentar agreement, resulting from the controversy surrounding branch time, was therefore a mandatory bargaining subject.

■ It is at this point, however, that our view splits from that of the Board. The ALJ found, and Grainger so argues on appeal, that even if Grainger was obligated to negotiate the cancellation of the Rentar contract with Local 710, the union waived its right to bargain by failing to assert it. The ALJ found that Local 710 was given notice indirectly, on at least five separate occasions, that Grainger was going to cancel its contract with Rentar. Not only did the union fail to request negotiations with Grainger, but actually indicated that it was not interested in discussing the branch time problem with Grainger.

The union argues, and the Board so found, that it did not waive its bargaining rights. The union contends that when it learned that Grainger was definitely going to cancel the Rentar contract, it was too late to bargain. According to both the Board and the union, Grainger's cancellation of the contract was a "fait accompli."

We disagree. The record does not support the Board's finding that the union received no notice nor does it support the conclusion that a union request to bargain would have been futile.

The parties do not dispute that a union, which has notice of a proposed change which affects a mandatory bargaining subject, must make a timely request to bargain. *Citizen's National Bank of Wilmar*, 245 NLRB 389 (1979) *enfcd.*, 644 F.2d 40 (D.C.Cir.1981); *American Buslines, Inc.*, 164 NLRB 1055 (1967). Moreover, formal notice is not necessary as long as the union has actual notice. *U.S. Lingerie Corp.*, 170 NLRB 750 (1968). A union's failure to assert its bargaining rights will

result in a waiver of these rights. *NLRB v. Island Typographers, Inc.*, 705 F.2d 44, 51 (2d Cir.1983).

As early as December, 1979, Rentar became aware of Grainger's disenchantment with its services. Rentar was told that Grainger was considering terminating the contract. It appears that Rentar then informed its drivers that uniform mileage had become a sticking point which jeopardized Grainger's contract with Rentar. The drivers, interested in proposing a trade-off, then contacted Local 710 and asked whether Grainger was obligated to pay branch time. The union in turn, contacted Rentar and was informed that Rentar could lose the Grainger account if branch time problems were not resolved in Grainger's favor. The union responded that its contract was *not* with Grainger but rather with Rentar and that Rentar would have to honor the contract (and presumably, have to pay branch time). Those events took place in February, 1980.

Over the course of the next couple of months, the union authorized the drivers to negotiate their own agreement with Rentar concerning branch time. The union made a decision *not* to involve itself in the negotiations either with Grainger or anyone else. Several proposals were made but none were acceptable to both the drivers and Grainger. At no time did the union indicate that it had any desire to act on behalf of its drivers.

As we have already chronicled, Grainger's dissatisfaction with Rentar continued to grow until Grainger began to talk with TDI about handling the Grainger account. Following a meeting in early May, 1980, between Grainger and TDI, TDI called Local 710 and notified the union that it might be in a position to take over the Grainger account from Rentar. Although the union agreed to discuss the matter with TDI, it indicated absolutely no interest in negotiating with Grainger.

Finally, on May 26, 1980, Grainger gave Rentar notice of its intent to cancel the contract under a 30-day notice provision. Rentar immediately notified the union. Again, the union made absolutely no effort to contact Grainger.

On June 10, 1980, the union met with TDI to discuss a branch time rider on the new TDI contract. The union not only discussed the matter with TDI [5] but agreed to a rider. No effort was made to contact Grainger directly.

Under the circumstances as described above, we find that the union had more than enough notice that the issue of branch time could result in a termination of the Rentar contract. In fact, Rentar's potential replacement, TDI, notified the union and then later actually negotiated with the union. Further, Rentar itself notified the union that Grainger was not likely to back down on the branch time issue and that the Rentar contract could be cancelled.[6]

Finally, notwithstanding the earlier notices and warning signs, the union had an opportunity to negotiate directly with Grainger after Grainger gave its 30-day notice of cancellation. If, during that time, the union was in a position to discuss a branch time rider with TDI, as it did, it could certainly have done so with Rentar. Had it done so, the union perhaps could have salvaged the contract. We hold that Grainger's cancellation of the Rentar contract was not a "fait accompli." The union's failure to assert its bargaining rights constituted a waiver of those rights. We agree with the Second Circuit Court of Appeals that, "a union cannot simply ignore its responsibility to initiate bargaining over subjects of concern and thereafter accuse the employer of violating its statutory duty to bargain." *Island Typographers*, 705 F.2d at 51.

Based on the foregoing, we find that because the union waived its right to bar-

---

5. The fact that the union discussed the matter with TDI indicates that the union was not concerned about whether Grainger's contract was with Rentar or TDI, as long as their drivers were used.

6. As counsel for Grainger pointed out at oral argument, if Rentar and Grainger are indeed joint employers of the Rentar drivers, Rentar's notice to the union would also have been Grainger's notice to the union.

gain with Grainger, Grainger did not violate §§ 8(a)(5) and 8(a)(1) of the NLRA when it failed to negotiate about the cancellation of the Rentar contract with Local 710. Grainger's petition for review is GRANTED, the order of the Board is VACATED and the Board's cross-application for enforcement is DENIED.