**G. HEILEMAN BREWING COMPANY, INC., Petitioner—Cross–Respondent,**

**v.**

**NATIONAL LABOR RELATIONS BOARD,**
**Respondent—Cross–Petitioner.**

Nos. 88–2905 & 88–3069.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1989.

Decided July 19, 1989.

Daniel R. Begian, Ralph E. Kennedy, McMahon, Berger, Hanna, Linihan, Cody & McCarthy, St. Louis, Mo., for G. Heileman Brewing Co., Inc.

Aileen A. Armstrong, Appellate Court, Enforcement Litigation, Julie Broido, William R. Stewart, N.L.R.B. Washington, D.C., Joseph H. Solien, N.L.R.B., St. Louis, Mo., for N.L.R.B.

Sally E. Barker, Schuchat, Cook & Werner, St. Louis, Mo., Barbara Sapin, for International Broth. of Elec. Workers, Local 309.

Before FLAUM and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The petitioner—cross-respondent, G. Heileman Brewing Company, Inc. ("Heileman"), seeks review of a National Labor Relations Board ("NLRB" or "Board") order finding Heileman in violation of § 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"). Conversely, the respondent—cross-petitioner, the NLRB, seeks enforcement of its order. In its decision, the NLRB determined that Heileman wrongfully refused to bargain with Local

Union 309 of the International Brotherhood of Electrical Workers ("Local 309") over its decision to terminate the services of Lowry Electric Company ("Lowry") and to subcontract its electrical maintenance work to Bienco Electric Company ("Bienco"). Therefore, the Board ordered Heileman to cease and desist from refusing to recognize or bargain with Local 309, to reinstate its former maintenance electricians with full back pay and seniority rights, and to post remedial notices.

On appeal, Heileman raises three issues. First, Heileman argues that it is not a joint employer with Lowry of the maintenance electricians working at its Belleville, Illinois brewery and thus, did not have an obligation to bargain with Local 309, which represented the electricians. Second, Heileman contends that even if it did have a duty to bargain, Local 309 waived its right to negotiate by unnecessarily waiting approximately six weeks before it made a demand upon Heileman to bargain. Finally, Heileman contends that our court should not enforce the Board's order because it is punitive in nature. For the reasons set forth below, we grant the NLRB's cross-application for enforcement of its order and deny Heileman's petition for review.

I

Carling National Breweries operated a brewery in Belleville, Illinois. Its employees at the brewery were represented by various unions, including Local 309 which represented its maintenance electricians. In 1979, Heileman acquired this brewery. Because it anticipated closing the brewery, Heileman negotiated a closing agreement with the unions.[1] The agreement provided that if Heileman should resume operations at the brewery, the collective bargaining agreements would go into effect for ninety days, after which they would be open to negotiations. Following its acquisition of the Belleville brewery, Heileman laid off

the employees. A few months later, however, Heileman reopened the brewery and reinstated its former employees, including the maintenance electricians, in accordance with the closing agreement. Heileman then immediately sought to renegotiate its collective bargaining agreements with all the unions except Local 309. Heileman requested that the maintenance electricians work under an extension of their previous collective bargaining agreement until Heileman first negotiated new contracts with the other unions.

In early 1980, after Heileman had entered into new collective bargaining agreements with the other unions, it began negotiations with Local 309. During the negotiations, Heileman proposed subcontracting its electrical maintenance work. Heileman wanted to use subcontracting as a way of justifying to the other unions why the maintenance electricians received a higher rate of pay. Although Local 309 had some reservations, it did not oppose subcontracting the electrical maintenance work. Heileman and Local 309 then negotiated the terms under which Heileman would subcontract. They agreed that the maintenance electricians currently employed by Heileman would be transferred to the subcontractor's payroll with their current seniority status and that Heileman would choose only a firm that was a signatory to the area contract between Local 309 and the local chapter of the National Electrical Contractors Association ("NECA"), a multiemployer bargaining association. Heileman and Local 309 further agreed to specific exceptions to the NECA contract, such as starting times, that would govern the maintenance electricians working at Heileman's brewery. Heileman and Local 309, however, did not reduce their agreement to writing.

Instead, Heileman chose its subcontractor, Lowry. On August 5, 1980, Local 309 and Lowry entered into an agreement as an addendum to the NECA contract. This addendum incorporated all the terms of

---

1. Although the closing agreement was technically between Carling National Breweries and the unions, the ALJ found that Carling was just a nominal party to the agreement because Heile-man was waiting for SEC approval of its acquisition of Carling National. *See* ALJ's Decision at 3 n. 3.

subcontracting the electrical maintenance work at the brewery to which Local 309 and Heileman had agreed. The addendum also specifically provided that it would run concurrently with the NECA contract. The next day, Heileman and Lowry entered into their subcontracting agreement, which specifically provided that Lowry would perform all electrical maintenance work according to the terms of the addendum. After Heileman and Lowry had entered into the subcontracting agreement, the maintenance electricians, who had formerly worked for Heileman, became Lowry employees, and Lowry assigned them to work at Heileman's brewery.[2]

Although Lowry was technically in charge of the maintenance electricians, Lowry supervisors rarely came to the brewery to check on them. Rather, it was Heileman that apparently exercised supervisory authority over the maintenance electricians on the infrequent occasions when such supervision became necessary. Heileman decided, without informing Lowry, when the maintenance electricians would work overtime. Heileman also notified Lowry when it was dissatisfied with a particular maintenance electrician's work. Additionally, Heileman treated the maintenance electricians as if they were still Heileman employees. For example, the maintenance electricians used the same time cards, time clock, lunchroom, and lockers as the Heileman employees. The maintenance electricians also participated in company programs just like Heileman's employees. Indeed, the maintenance electricians, who were transferred from Heileman to Lowry, never worked for Lowry

other than at Heileman's Belleville brewery.

By 1984, Heileman became concerned about the rising cost of subcontracting its electrical maintenance work with Lowry pursuant to the NECA contract and the Lowry–Local 309 addendum. Local 309 became aware that Heileman was talking to other subcontractors. In August 1984, at Heileman's request, Heileman and Lowry renewed their subcontracting agreement only until December 31, 1984, instead of the usual two-year period. Apparently, this shortened renewal period was due to Heileman's concerns over its cost of subcontracting its electrical maintenance work. In late August, when Local 309 and Lowry renewed their addendum, Lowry informed the union that its agreement with Heileman was renewed only until the end of the year. Local 309 told Lowry that it would go along with that arrangement.

In mid-November 1984, two Heileman officials, plant manager Allen Lacombe and industrial relations manager Charles Rhein, met with Oliver Hartman and George Fisher from Lowry. At this meeting, Lacombe told the Lowry officials that Heileman wanted a nonnegotiable $5.00 per hour reduction in the maintenance electrician's base wage rate.[3] Lacombe then asked Hartman to check with Local 309 to see whether it would accept this pay reduction. Shortly thereafter, Hartman and Fisher met with Local 309's assistant business manager, James Hankins, and notified him of Heileman's demand. Although Hankins did not think the pay reduction would be acceptable to Local 309, he indicated that he would get back in touch with them. In

---

**2.** Eventually, two of the original maintenance electricians stopped working for Heileman, and Lowry replaced them with two of its own electricians.

**3.** Heileman argues that its request for a $5.00 reduction in the maintenance electrician's base wage rate was never represented as being nonnegotiable. *See* Brief for Appellants at 43 n. 33. At the hearing before the ALJ, two Heileman officials testified that they did not represent their demand for a wage cut as nonnegotiable, *see* Tr. at 553, 575, whereas two Lowry officials testified that it was presented to them as nonnegotiable, *see id.* at 190, 505. The ALJ expressly

credited the testimony of the Lowry officials, *see* ALJ's Decision at 13, and the Board accepted the ALJ's credibility determinations, *see* NLRB's Decision and Order at 1 n. 2. Our court must accept the ALJ and Board's credibility determinations unless the party challenging those determinations shows exceptional circumstances warranting a different result. *Roadmaster Corp. v. NLRB,* 874 F.2d 448, 453 n. 4 (7th Cir.1989); *NLRB v. Dorothy Shamrock Coal Co.,* 833 F.2d 1263, 1265 (7th Cir.1987). Because Heileman has failed to make this showing, we will not disturb the credibility determination that the ALJ and the Board made.

late November, Lacombe called Hartman to inquire whether Local 309 had given Lowry a firm response; Lowry, however, had not yet heard from Local 309.

On December 26, 1984, after more than a month's delay, Local 309 informed Lowry that the $5.00 per hour pay reduction was unacceptable to Local 309. However, Local 309 was willing to assemble a package of cuts worth $2.40 per hour that would not be in the base wage rate. Lowry promptly presented the union's counteroffer to Heileman, which would not accept it. Heileman also dismissed Lowry's suggestion that Heileman talk directly with Local 309. On December 28, Local 309 presented a second offer to Lowry in which the union would agree to a reduction of $2.50 to $3.00 per hour (not in the base wage rate) so long as Heileman would sign a document acknowledging its status as a joint employer of the maintenance electricians and its duty to bargain with Local 309. When Lowry informed Heileman of this proposal, Heileman not only rejected the offer, but also told Lowry that it would not be renewing Lowry's subcontracting agreement after it expired on December 31. Finally, on December 31, 1984, Local 309 asked Lowry to inform Heileman that Local 309 would be willing to take a pay reduction of $2.50 per hour, without Heileman signing a document acknowledging its status as a joint employer or its duty to bargain with Local 309. Once again, Heileman rejected the proposal.

On January 1, 1985, Heileman entered into a subcontracting agreement with Bienco, which did not have a collective bargaining agreement with Local 309. Bienco immediately supplied its own maintenance electricians to work at the brewery. On January 3, 1985, Local 309 sent a letter to Heileman demanding that it negotiate directly with the union. Heileman, however, declined to meet with the union.

On January 8, 1985, Local 309 filed an unfair labor practice charge against Heile-

man. A complaint was issued, charging Heileman with violating § 8(a)(1) and (5) of the NLRA by subcontracting its maintenance electrical work to Bienco without affording Local 309 an opportunity to bargain over that decision. After conducting a hearing, the ALJ found that Heileman and Lowry were joint employers of the maintenance electricians, and thus Heileman had a duty to bargain with Local 309. The ALJ further found that Local 309 had not waived its right to bargain over this issue. Therefore, Heileman committed an unfair labor practice by refusing to negotiate with Local 309. The NLRB affirmed the ALJ's decision and order, as modified.[4]

## II

█ Under § 8(a)(5) of the NLRA, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S. C. § 158(a)(5). The NLRA defines collective bargaining as the duty to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment...." *Id.* § 158(d). An employer will violate this statutory duty if it unilaterally changes a term or condition of employment without first giving the union a chance to bargain meaningfully over the change. *See First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 674–75, 101 S.Ct. 2573, 2578–79, 69 L.Ed.2d 318 (1981); *NLRB v. Island Typographers, Inc.*, 705 F.2d 44, 48 (2d Cir.1983). Although Lowry was the actual employer of the maintenance electricians, Heileman would also be subject to this statutory duty to bargain with Local 309, if it was a joint employer of the maintenance electricians.

Heileman could be considered a joint employer of the maintenance electricians only if it exerted significant control over them. *NLRB v. Western Temporary Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir.1987); *Lutheran Welfare Servs. v. NLRB*, 607 F.2d 777,

---

4. The Board did not adopt the ALJ's finding that Heileman had breached a contractual obligation to Local 309 because that issue was not fully litigated. *See* NLRB's Decision and Order at 1 n. 2. The Board also rejected the ALJ's determination that Heileman had violated § 8(a)(3) of the NLRA. *See id.*

778 (7th Cir.1979). This issue is essentially a factual question, *see Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 899, 11 L.Ed.2d 849 (1964), which depends upon "such factors as the supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions," *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 247 (7th Cir.1988). Because the issue of joint employer status is a factual determination, we must uphold the Board's finding so long as it is supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *Davis v. NLRB*, 617 F.2d 1264, 1271 (7th Cir.1980). "We consider substantial evidence to be 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Roadmaster*, 874 F.2d at 452 (quoting *Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 459); *accord NLRB v. Del Rey Tortilleria, Inc.*, 787 F.2d 1118, 1121 (7th Cir.1986). Moreover, we will accept all credibility determinations and reasonable inferences made by the Board. *See Dorothy Shamrock Coal Co.*, 833 F.2d at 1265.

Heileman strenuously argues that it had no duty to bargain with Local 309 over its decision to subcontract its electrical maintenance work with Bienco because it was not a joint employer of the maintenance electricians. After reviewing the record as a whole, however, we believe that substantial evidence supports the Board's determination that Heileman was a joint employer of the maintenance electricians.

First, we note that Heileman was primarily responsible for establishing the terms of the addendum to the NECA contract entered into by Local 309 and Lowry. Although Lowry and Local 309 signed the addendum, it was really negotiated by Heileman and Local 309. *See* Tr. at 48 ("Lowry signed the addendum agreement but it was negotiated with Heileman."); *id.* at 188–89 (testimony of Lowry's president to the effect that Lowry did not negotiate

the terms of the addendum). Moreover, Heileman apparently would choose only a subcontractor who would be willing to go along with the conditions upon which Local 309 and Heileman had agreed. Indeed, Heileman's contract with Lowry specifically states that Lowry must provide all supervision and labor according to the addendum. *See* General Counsel's Exhibit No. 7. Therefore, Heileman was responsible for some of the terms and conditions under which the maintenance electricians worked.

Second, Heileman assured Local 309 that the maintenance electricians currently working for it would be transferred to the subcontractor. *See* Tr. at 547. Thus, Lowry would not have been free to hire who it wanted or to supply its own maintenance electricians to the brewery, unless an opening developed. Moreover, the maintenance electricians who were former Heileman employees worked exclusively at the brewery and did not work for Lowry at other job sites. *See id.* at 208. These facts are indicative of Heileman's control over the maintenance electricians. *See Western Temporary Servs.*, 821 F.2d at 1266.

Furthermore, although the maintenance electricians did not usually require supervision, it was Heileman that provided such supervision when needed. One of the maintenance electricians testified that superintendent Richard Voss had given him guidance on how certain jobs were to be done. *See* Tr. at 391, 396–97, 399–400. Apparently, Heileman also decided when the maintenance electricians would work overtime because Lowry was never notified. *Id.* at 510–11. Additionally, Heileman initiated disciplinary action against the maintenance electricians. *See id.* at 501–04. In contrast, Lowry supervisors rarely came to the brewery. *Id.* at 285, 498. These facts are further evidence of Heileman's control over the maintenance electricians. *See Sun–Maid Growers v. NLRB*, 618 F.2d 56, 58 (9th Cir.1980).

Finally, we note that in many respects Heileman treated the maintenance electricians in the same manner as its own employees. For example, the maintenance electricians used the same time clock, time

cards, lunchroom, and lockers as the Heileman employees. Tr. at 271, 385, 388. The maintenance electricians also received other benefits, such as free beer and invitations to Christmas parties, like Heileman's employees. *See id.* at 410–11, 467–68. Therefore, notwithstanding the fact that Heileman's contract with Lowry states that Lowry is "to provide all supervision and labor," General Counsel's Exhibit No. 7, we find that there is substantial evidence to support the Board's determination that Heileman was a joint employer of the maintenance electricians.

### III

■ Heileman also argues that even if it were a joint employer and had a duty to bargain with Local 309 over its decision to subcontract its electrical maintenance work to Bienco, Local 309 waived its right to negotiate by failing to make a timely demand for bargaining. It is possible for a union to waive its statutory right to bargain over a term or condition of employment. *See Grainger,* 860 F.2d at 248–49; *NLRB v. Henry Vogt Mach. Co.,* 718 F.2d 802, 806–07 (6th Cir.1983); *Island Typographers,* 705 F.2d at 48. However, we cannot find that Local 309 waived its right to bargain without a clear and unmistakable showing of a waiver. *See Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); *International Union, UAW v. NLRB,* 802 F.2d 969, 973 (7th Cir.1986); *NLRB v. Harvstone Mfg. Corp.,* 785 F.2d 570, 578 (7th Cir.), *cert. denied,* 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986). After reviewing the evidence, we believe that Heileman has failed to make a clear and unmistakable showing that Local 309 waived its right to bargain.

It is true that Local 309 unnecessarily waited over a month from the time Lowry notified it of Heileman's demand of a $5.00 per hour wage reduction until the union notified Lowry that this demand was unacceptable. Contrary to Heileman's position,

however, we are unwilling to rule as a matter of law that this delay is clear and unmistakable evidence of a waiver. After reviewing the record as a whole, we find that Local 309's subsequent counteroffers of a $2.00–$3.00 pay cut—proposed before Heileman's subcontract with Lowry expired and before Heileman entered into a new subcontract with Bienco—amounted to a demand upon Heileman to bargain.

First, we note that both parties used Lowry as a middleman in their communications. When Heileman first presented its nonnegotiable wage cut demand to Lowry, it expressly asked Lowry to check with Local 309 to see whether the union would accept the pay reduction. *See* Tr. at 192, 505. Heileman also contacted Lowry in late November to see if Lowry had received a response from Local 309. *See id.* at 575. On December 26, when Local 309 finally told Lowry that a $5.00 pay reduction was unacceptable, Local 309 made its own pay-cut proposal, which Lowry promptly presented to Heileman. *See id.* at 576. Two days later, Local 309 proposed a second offer to Lowry that included a wage cut so long as Heileman would sign a document in which Heileman acknowledged its status as a joint employer and its duty to bargain with the union if it terminated its subcontract with Lowry. Lowry presented this proposal to Heileman.[5] *See id.* at 577. Finally, Local 309 made a third proposal to Lowry, which in turn, presented it to Heileman. *See id.* at 579. Therefore, because Heileman and Local 309 used Lowry as a middleman, Local 309's three counteroffers presented to Lowry, which promptly proposed them to Heileman, were the equivalent of a demand on Heileman to bargain.

Second, even if Heileman and Local 309 did not use Lowry as a middleman, Local 309's three counteroffers, which clearly put Lowry on notice that the union wanted to bargain, were also a demand on Heileman to bargain because of its joint employer status. In a joint employer situation, a union's demand to bargain made on one

---

5. By the very terms of this document, Heileman undisputably had notice that Local 309 expected Heileman to bargain over this issue before it entered into a subcontracting agreement with Bienco. *See* General Counsel's Exhibit No. 24.

joint employer is a demand on the other joint employer when that other employer is aware of the union's demand to bargain. Because Local 309 had given Lowry notice that it wanted to bargain by presenting three counteroffers and Lowry notified Heileman of these proposals, Heileman, as a joint employer, also had notice that Local 309 expected to negotiate over the issue.

Furthermore, we reject Heileman's claim that our recent decision in *Grainger,* 860 F.2d at 244, requires us to find that Local 309 has waived its right to bargain. In that case, Grainger and Rentar were joint employers of the drivers that Rentar supplied to Grainger pursuant to a contract. After a few years, a dispute arose over whether the drivers were entitled to be paid for the nondriving time they spent at a Grainger plant. Due to this dispute, Grainger informed Rentar that it was considering terminating its contract with Rentar. When Rentar notified the union that represented the drivers of this development, the union responded that its contract was with Rentar, not Grainger, and Rentar had to honor the contract and presumably pay the drivers for their nondriving time. A few months later, another company, TDI, contacted the union and stated that it might be taking over Rentar's account with Grainger. Once again, however, the union showed no interest in discussing the matter with Grainger. Finally, when Rentar informed the union that Grainger had given it a thirty-day notice of its intent to terminate the contract, the union again failed to contact Grainger. As our court noted, "The union made a decision *not* to involve itself in the negotiations either with Grainger or anyone else." *Id.* at 249. Thus, the *Grainger* court found that the union waived its right to bargain with Grainger. *Id.*

Obviously, the facts in the *Grainger* case are inapposite to those in this appeal. In this case, rather than acting disinterested, Local 309 has consistently tried to negotiate a compromise on this issue with Lowry and Heileman. As the ALJ found, it was Heileman, not the union, that refused to negotiate by taking a nonnegotiable stance toward the wage-cut dispute. *See* ALJ's Decision at 13 (Heileman's "overall course of conduct indicates that it was taking a non-negotiable stance, because [Heileman] was determined to substantially reduce the electricians' wage rate, with or without [Local 309], and preferably without."). Therefore, we reject Heileman's argument that Local 309 waived its right to bargain over Heileman's decision to subcontract its electrical maintenance work to Bienco.

■ Because Local 309 did not waive its right to bargain, Heileman, as a joint employer of the maintenance electricians, had a duty to bargain once Local 309 made a demand to negotiate. Since Local 309's three counteroffers amounted to a demand upon Heileman to bargain, Heileman violated § 8(a)(5) by refusing to negotiate with Local 309. *See Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 210–15, 85 S.Ct. 398, 403–05, 13 L.Ed.2d 233 (1964). Additionally, Heileman's actions also violated § 8(a)(1) of the NLRA. Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce an employee in the exercise of his § 7 rights. 29 U.S.C. § 158(a)(1). One right protected by § 7 is the right of employees "to bargain collectively through representatives of their own choosing." *Id.* § 157. Thus, Heileman's refusal to negotiate in violation of § 8(a)(5) derivatively violated § 8(a)(1) by interfering with the right of the maintenance electricians to bargain collectively through Local 309. *See Metromedia, Inc. v. NLRB,* 586 F.2d 1182, 1188 (8th Cir.1978) (The company's "violation of § 8(a)(5) derivatively violated § 8(a)(1) by interfering with the collective bargaining rights of the employees."). Therefore, we uphold the Board's determination that Heileman violated § 8(a)(1) and (5) by refusing to negotiate with Local 309 over its decision to subcontract its electrical maintenance work to Bienco.

## IV

■ Finally, Heileman challenges the Board's order. In essence, Heileman argues that the order is punitive in so far as it requires Heileman to rehire the Lowry

maintenance electricians with full back pay and seniority rights and to reimburse the various trust funds established by the NECA and the union, even though its contract with Lowry has already expired. *See* ALJ's Decision at 27, ¶ 2(a), (c).

Section 10(c) of the NLRA allows the Board to require any person who has committed an unfair labor practice "to cease and desist from such unfair labor practice and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies" of the NLRA. 29 U.S.C. § 160(c). So long as the Board's order is in furtherance of the policies of the NLRA, the Board has wide discretion in requiring an employer to take whatever affirmative action it deems necessary to cure an unfair labor practice. *See Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 539, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). The Board's order, however, must be remedial in nature, not punitive. *See Local 60, United Bhd. of Carpenters v. NLRB*, 365 U.S. 651, 655, 81 S.Ct. 875, 877–78, 6 L.Ed. 2d 1 (1961); *Yorke v. NLRB*, 709 F.2d 1138, 1144–45 (7th Cir.1983), *cert. denied*, 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984).

In contesting the Board's order, Heileman principally relies on *Rayner v. NLRB*, 665 F.2d 970 (9th Cir.1982), to support its claim that the Board's remedy is an unenforceable punitive order. In *Rayner*, the Board found the employer in violation of § 8(a)(1) and (5) and entered a remedial make-whole order that lasted beyond the end of the labor agreement. *Id.* at 976. The Ninth Circuit enforced the order to the extent that it applied to the end of the labor agreement, but refused to enforce the order for the period after the expiration of the contract. The court held that be-

cause the employer had offered to bargain with the union for a new contract and the union rejected that offer, the Board's order would be punitive if it applied after the expiration of the labor agreement. *See id.* at 976–77. The court noted, however, that if the employer "refused to bargain for a new contract ... continuing liability would be clear." *Id.* at 978.

Heileman's reliance on *Rayner* is misplaced. Unlike the situation in *Rayner*, Heileman has not offered to negotiate with Local 309.[6] Rather, as the Ninth Circuit observed in *Rayner*, this is a case in which the employer has refused to bargain, making continuing liability an appropriate remedy. Our court has approved Board orders similar to this one, *see, e.g., American Cyanamid Co. v. NLRB*, 592 F.2d 356, 358 (7th Cir.1979), and we cannot devine any reason why we should not also enforce this remedial order. The Board's order is merely an appropriate make-whole remedy requiring Heileman to abide by the terms of the collective bargaining agreements covering the Lowry maintenance electricians until Heileman and Lowry negotiate a new agreement with Local 309 or bargain in good faith to an impasse. Therefore, we reject Heileman's argument that this order is punitive.

## V

For all the foregoing reasons, we GRANT the NLRB's application for enforcement and DENY Heileman's petition for review.

---

**6.** Although the parties used Lowry as a communications middleman, Heileman did not bargain, or offer to bargain, with Local 309 through Lowry. The ALJ found that Heileman presented a nonnegotiable demand for a $5.00 per hour wage reduction to Lowry and asked Lowry to check with Local 309 to see whether the union would accept the pay cut. *See* ALJ's Decision at 13. Subsequently, Heileman rejected three counteroffers Local 309 presented to it

through Lowry and failed to make any proposals in response to the union's attempts to negotiate. Thus, it is clear from Heileman's conduct that Heileman did not engage in, or offer to engage in, good faith bargaining as required by the NLRA. *See NLRB v. Schwab Foods, Inc.*, 858 F.2d 1285, 1292–93 (7th Cir.1988) (finding that the company failed to bargain in good faith based on the totality of the circumstances).