**TEAMSTERS LOCAL UNIONS NOS. 75 AND 200, Plaintiffs–Appellants,**

v.

**BARRY TRUCKING, INC., and Joseph T. Ryerson & Son, Inc., Defendants–Appellees.**

**Barry Trucking, Inc., Plaintiff–Appellant,**

v.

**Joseph T. Ryerson & Son, Inc., Defendant–Appellee.**

Nos. 98–1982, 98–1994.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1998.

Decided May 7, 1999.

Frederick Perillo (argued), Scott D. Soldon, Previant, Goldberg, Uelmen, Gratz, Miller & Bruegeman, Milwaukee, WI, for Plaintiffs–Appellants Teamsters Local Unions 75 and 200.

Matthew J. Flynn (argued), Quarles & Brady, Milwaukee, WI, for Barry Trucking.

William Duffin, Godfrey & Kahn, Milwaukee, WI, for Joseph T. Ryerson & Son, Inc. in No. 98–1982.

Gary L. Prior (argued), McDermott, Will & Emery, Chicago, IL, William Duffin, Godfrey & Kahn, Milwaukee, WI, for

Joseph T. Ryerson & Son, Inc. in No. 98–1994.

Before POSNER, Chief Judge, CUMMINGS[1], and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

In 1964, Barry Trucking, Inc. ("Barry"), began providing steel-hauling services to Wisconsin steel-producer Joseph T. Ryerson & Son, Inc. ("Ryerson"). In January of 1998, Ryerson signed a contract for steel-hauling services with a different cartage company, and on March 16, 1998, Barry filed suit against Ryerson in state court alleging a breach of contract and seeking a temporary restraining order ("TRO") and preliminary injunction to prevent Ryerson from terminating the relationship with Barry. On March 17, 1998, the Teamsters Local Union Nos. 75 and 200 ("Teamsters"), the union that represented Barry's drivers, filed suit against Barry and Ryerson in federal court alleging that Ryerson was a joint-employer of the drivers who hauled Ryerson's steel. The Teamsters also filed a petition for a TRO and preliminary injunction requiring Ryerson to arbitrate a solution pursuant to an arbitration clause in the Teamsters' collective bargaining agreement with Barry, despite the fact that Ryerson was not a signatory to that agreement. On March 18, 1998, Ryerson removed the Barry action to the federal district court and joined it with the closely related Teamsters action.

On March 19, 1998, the district court issued the Teamsters' TRO and scheduled an evidentiary hearing for March 23 on the Teamsters' joint-employer claim. At the conclusion of the hearing, the district judge ruled that Ryerson was not a joint-employer of the Teamsters drivers, dissolved the Teamsters' TRO, denied the Teamsters' preliminary injunction, and denied Barry's motion for a TRO and preliminary injunction. On April 7, 1998, the trial judge held an evidentiary hearing on

Barry's breach of contract claim and found that Barry did not have a valid contract with Ryerson. The Teamsters and Barry appeal. We affirm.

## I. BACKGROUND

In July of 1964, Ryerson and Barry entered into a four-month contract for steel-hauling services. After the initial four-month period, the relationship between Barry and Ryerson continued "on a gentleman's handshake," without a written contract. Under the agreement, Ryerson relied on Barry for some twenty drivers and equipment, including tractors and trailers, to deliver its product. The agreement between Barry and Ryerson required that Barry's trucks be painted in Ryerson's red color and bear the Ryerson name. Each vehicle also bore the designation that it was owned and operated by Barry. Some, but not all, of Barry's drivers also wore Ryerson hats and jackets, provided by Ryerson at no charge. Barry, under the contract, determined which drivers would be hired and which drivers were qualified to handle steel and related products. All training was provided by Barry, though drivers were dispatched by and reported on a daily basis to Ryerson. Drivers were paid by Barry at rates of compensation determined by Barry and consistent with labor agreements between Barry and the Teamsters. Barry maintained and implemented the payroll and was responsible for withholding all sums, whether for taxes, health insurance, or Social Security. Barry was responsible for providing all health insurance and workers' compensation coverage consistent with agreements with the Teamsters. Barry was also responsible for maintaining all Department of Transportation filings and record-keeping. Barry was obliged to provide all liability, collision, and loss of product insurance coverages for the drivers, whether caused by accident or theft. Once

---

1. Though Judge Cummings participated in the consideration of this case, he passed away prior to the rendering of the decision.

steel left Ryerson, Barry was solely responsible for ensuring that the product was safely delivered.

As to vacation and sick leave, such matters were solely within the purview of Barry and the individual drivers, subject to an understanding between Barry and Ryerson that no more than two of the Barry drivers assigned to Ryerson could vacation at the same time. Though Ryerson had shop code standards for its employees, including the wearing of steel-toed shoes and hard hats, those standards were not imposed by Ryerson on the Barry drivers. Ryerson had no direct form of discipline for the Barry drivers, though Ryerson did occasionally issue comments to Barry or its drivers that may have caused Barry to take disciplinary actions against its drivers. Ryerson also played no role in determining who was assigned to its account by Barry.

In November of 1996, Ryerson determined that it needed to reduce its freight costs by at least twenty percent. To this end, Ryerson officials met with Barry officials to discuss such a reduction. During the meeting, Ryerson gave Barry a written memorandum entitled "Trucking—Barry 1997, 98, 99." The memo provided:

CONDITIONS FOR A THREE YEAR CONTRACT WITH BARRY:
DECREASE FREIGHT COSTS MINIMUM OF 20% OVER THREE YEARS —IDENTIFIED AS "REAL" DOLLAR SAVINGS
PAYMENTS TO BARRY BASED ON PRODUCTIVITY CRITERIA

In response, Barry suggested a "pay for performance" or "productivity billing" arrangement, as opposed to an hourly fee, designed to reduce Ryerson's transportation charges by twenty percent over a three-year period. The parties met again in December of 1996, and Ryerson gave Barry a second written memorandum entitled "Barry Freight Charges" which included proposed billing rates based on the "pay for performance" arrangement. Barry informed Ryerson that Barry would need to review the figures contained in the memorandum in order to respond. Barry also informed Ryerson that they would need to negotiate a new contract with the Teamsters in order to implement the new billing scheme. After the 1996 meetings, Barry negotiated a new labor agreement with the Teamsters containing the "pay for performance" system. The labor agreement, due to expire on April 30, 2001, provided for an initial 90–day trial period and gave the Teamsters the right, by vote, to make the agreement permanent. Barry and the Teamsters agreed that any party, including Ryerson, could terminate the "pay for performance" system for any reason and revert back to the hourly fee. Barry and the Teamsters also signed a collective bargaining labor agreement that required all violations of the employment agreement to be subject to binding arbitration. Ryerson did not participate in negotiations with the Teamsters.

In June of 1997, Barry implemented the "pay for performance" system and billed Ryerson accordingly. After thirty days, Ryerson requested that Barry suspend the system "because it proved too costly." Barry contends that Ryerson asked for the suspension so that adjustments could be made to Ryerson's loading and shipping practices. In November of 1997, Ryerson asked Barry to reimplement the system. The new system ran for the remaining 60 days of the trial period, after which Ryerson signed a contract with USF Logistics, a non-Teamsters cartage company, and terminated its business relationship with Barry.

On March 16, 1998, Barry filed suit against Ryerson in state court, alleging a breach of contract and seeking a TRO and preliminary injunction to prevent Ryerson from terminating the contract between the parties. The following day, the Teamsters filed suit against Barry and Ryerson in federal court alleging that Ryerson was a joint-employer of the Teamsters drivers. The Teamsters also filed a petition for a TRO and preliminary injunction seeking to require Ryerson to arbitrate a solution

pursuant to the Teamsters' collective bargaining agreement with Barry. On March 18, 1998, the two actions were joined, and on March 19, 1998, the district court issued the Teamsters' TRO and scheduled an evidentiary hearing for March 23 on the Teamsters' joint-employer claim. On March 23, the district judge ruled that Ryerson was not a joint-employer of the Teamsters drivers, dissolved the Teamsters' TRO, denied the Teamsters' preliminary injunction, denied Barry's motion for a TRO and preliminary injunction, and ruled that Barry did not have a valid contract with Ryerson.

## II. ISSUES

On appeal, the joint-appellants contend that: (1) the district court erred in concluding that Ryerson was not a joint-employer of the Teamsters drivers; (2) the district court erred in concluding that no contract existed between Ryerson and Barry; and (3) the district court's denial of injunctive relief was an abuse of discretion.

## III. DISCUSSION

*A. The Joint–Employer Claim*

 The existence of a joint-employer relationship is a question of fact and this Court reviews questions of fact for clear error. *See W.W. Grainger, Inc. v. NLRB,* 860 F.2d 244, 247 (7th Cir.1988). To reverse under the "clearly erroneous" standard, this Court must be "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

 As in the case of *DiMucci Constr. Co. v. NLRB,* 24 F.3d 949, 952 (7th Cir. 1994), the appellants contend that Ryerson was a joint-employer of the Teamsters drivers. In DiMucci, we held that the factors utilized to determine whether a party is a joint-employer are: "(1) supervision of employees' day-to-day activities; (2) authority to hire or fire employees; (3) promulgation of work rules and conditions of employment; (4) issuance of work assignments; and (5) issuance of operating

instructions." *Id.* (citations omitted). The district court found that "although *DiMucci* is certainly instructive, it is not in any sense controlling with respect to the outcome of this case because of the factual posture of that case together with the limited facts before the Seventh Circuit and indeed the NLRB." In particular, the district court stated:

> The initial underpinnings of the case were driven by virtue of the fact that DiMucci and Wheeling acknowledged before the NLRB that they in fact were joint employers; in other words, initially never an issue between the parties and the union [as to the joint employer status]. It was only · after the consent agreement went astray that the NLRB stepped in and set aside the settlement agreement and began further enforcement proceedings because of treatment of certain employees inconsistent with the agreement by DiMucci and Wheeling; that is, they were not recalled consistent with the terms of the settlement agreement. Unfortunately because of the factual context that that case had at its beginning and given the fact that at the opening of the unfair labor practice hearing DiMucci and Wheeling, having acknowledged that they were joint employers, from my reading of the case left the Court of Appeals in a little bit of a lurch with respect to what the true status of Wheeling and DiMucci were. . . .

Instead, the district court found the NLRB case of *Osco Drug v. Truck Drivers, Oil Drivers, Local Union 705,* 294 NLRB 779, 1989 WL 224068 (1989), more analogous to the present facts and concluded that the *Osco* case propounded the "correct" joint-employer test to be utilized in this case. Under the *Osco* standard, shippers and carriers are "joint-employers" of the same group of employees when "it can be shown that they share or co-determine those matters governing essential terms and conditions of employment," that is, "there must be a showing that the employer meaningfully affects matters re-

lating to the employment relationship such as hiring, firing, discipline, supervision, and direction." 294 NLRB at 785 (citations and internal quotations omitted). The NLRB adopted this standard from the Third Circuit's decision in *NLRB v. Browning–Ferris Indus. of Pa., Inc.*, 691 F.2d 1117 (3rd Cir.1982). In *Osco*, the NLRB upheld an administrative law judge's determination that, under the Third Circuit joint-employer test, Osco was not a joint-employer of drivers employed by McNeil, a firm with whom Osco had contracted to transport Osco's goods to its stores. 294 NLRB at 780. The Osco contract specifically furnished McNeil with exclusive and sole control over its employees, including the ability to hire, fire, and discipline drivers. *See id.* As in the present case, McNeil (the Barry-like entity) had entered into a collective bargaining agreement with the drivers' union (the Teamsters-like entity), and Osco (the Ryerson-like entity) never participated in any negotiations with the union. Osco complained to McNeil about various drivers' performance and on occasion requested that certain drivers be removed from its account. *See id.* at *5. The drivers would report to the location where they picked up their tractors and were dispatched according to Osco's daily orders. *See id.* at *6. Osco dispatched drivers according to McNeil's standard policies relating to seniority, and the assignment of individual drivers to the Osco account was principally based on bidding under the McNeil seniority system. *See id.* at *7. Drivers assigned to Osco would remain on the Osco premises most of the workday to spot trailers and make sure that loads were ready for dispatch. Osco issued directives to McNeil concerning how the drivers should perform their work, including instructions on how to secure the trailers, how to report delays, and other problems they might have. *See id.* The compensation, vacation, and overtime of the drivers was determined by the collective bargaining agreement between McNeil and the drivers' union. *See id.* Vacation time and leave was requested through McNeil, not Osco. *See id.* Osco sold its uniform with its logo to McNeil drivers at a discount, but as in this case, drivers were not obliged to wear the Osco uniforms. McNeil carried insurance to cover all of its operations, including coverage for loss and damage to goods being transported, and for liability to third parties resulting from its employees' negligence. *See id.* at *14.

As in the case under consideration, in the 1980s, Osco sought to reduce its costs by changing the McNeil drivers' hours to eliminate overtime and reduce wages. *See id.* at *9. Osco knew that McNeil would have to negotiate such changes through bargaining with the union. During negotiations with the union, McNeil warned workers that it would lose the Osco account if the union did not agree to the changes in compensation. *See id.* at *10. With the union's consent, the drivers entered into an agreement with McNeil incorporating a number of Osco's demands. *See id.* Osco, however, remained unsatisfied with the drivers' concessions and eventually terminated its contractual arrangement with McNeil. *See id.* at *12. Based on all these facts, the administrative law judge, whose decision was ultimately affirmed by the NLRB, found that Osco was not a joint-employer of McNeil's drivers because Osco was not ultimately responsible for the "hiring, firing, discipline, supervision, and direction" of the drivers. *Id.* at *13 (citations and internal quotation omitted).

The most significant difference between *Osco* and the present case is the existence of the written contract between McNeil and Osco which defined the relationship between the parties and explicitly gave McNeil sole control over its drivers. In particular, the contract provided that it is "understood and agreed that [the McNeil drivers] shall be considered employees of [McNeil] and shall be subject to employment, discharge, discipline and control solely and exclusively by [McNeil]" and also that "[t]he relationship between the

parties hereto shall at all times be that of independent contractors and such status shall govern all relations between [McNeil, Osco], and any third parties...." *Id.* at *3. In the case under consideration, the district court found that *Osco* was analogous despite the existence of the written contract. The trial judge ruled that all of the other factual circumstances made *Osco* similar to the situation under consideration, and we are not "left with the definite and firm conviction that a mistake has been committed" by the trial court. *U.S. Gypsum Co.*, 333 U.S. at 395, 68 S.Ct. at 542. Thus, the trial court did not commit clear error in ruling that Ryerson was not a joint-employer of the Teamsters drivers.

The appellants also contend that the district court erroneously declined to follow this Court's decision in *Grainger* when it determined that Ryerson was not a joint-employer of the Teamsters. In that case, the Ryerson-like entity, Grainger, utilized drivers from a separate trucking company. 860 F.2d at 245. However, several key factors distinguish *Grainger* from our case: (1) Grainger retained the right to refuse to employ any driver; (2) it retained the right to control individual drivers' compensation; and (3) the contract between Grainger and the trucking company expressly provided that both parties had dual control over the drivers. *See id.* at 247. Thus, the district court ruled that *Grainger* was not related specifically "to drivers and equipment, but rather as the court described it, a rental of employees from a service that provided drivers to Grainger on an everyday basis." This factor, coupled with the fact that the present case deals with more than a simple employee/employer relationship, distinguishes *Grainger.* We hold that the district court's reasoning in distinguishing *Grainger* was not clearly erroneous.

## B. The Contract Claim

■ We next consider whether the trial court erred in determining that no contract existed between Barry and Ryerson. If a valid contract existed between Barry and Ryerson, then Barry was enti-tled to an injunction against Ryerson on its breach of contract claim. The existence of a contract is a mixed question of law and fact. *See Ransom v. United States*, 900 F.2d 242, 244 (Fed.Cir.1990). This Court reviews a district court's determination of a mixed question of law and fact under the clearly erroneous standard. *See G.J. Leasing Co., Inc. v. Union Elec. Co.*, 54 F.3d 379, 382 (7th Cir.1995).

■ At the outset, the district court found it beyond dispute that there was no written contract in the traditional sense relating to the terms of an agreement. Barry contends that the two memoranda that Ryerson provided to Barry in November and December of 1996 constituted a written offer for a three-year contract which Barry accepted when it told Ryerson that it would need to negotiate a new contract with the Teamsters, and Ryerson told Barry to proceed. Barry also contends that a document allegedly given to Ryerson's representative Mike Quinn ("Quinn") in March of 1997, which included a rate proposal under the "pay for performance" system, was purportedly agreed to by Quinn, and this acceptance constituted a contractual arrangement. However, none of the documents taken individually, or a combination of documents when considered together, appear to be a contract, and none are signed by either party. As to the contract allegedly agreed to by Quinn during the meeting in March of 1997, this document was entitled "Proposal to Ryerson" and includes a provision "proposed pricing." Thus, according to the very terms of the document, this was merely a proposal and not a contract. Upon review of all the documents, we agree with the trial court's conclusion that "while Barry would like them elevated to a stature of being contract documents, de facto [they] are really nothing more than ... negotiating points." We agree that, from the evidence presented, there is nothing more in this case "than an agreement to negotiate to ultimately reach an appro-

priate relationship that would provide opportunities for profit for both entities."

Another problem with the alleged contract was that the terms and duration of the agreement were not sufficiently definite. Although the primary objective of the contract was to reduce "real dollar savings" by twenty percent, it is unclear what the term "real dollar savings" means. Nowhere in the documents or memoranda of the purported contract is there any explanation of this term, nor can it be defined from past practices because the "pay for performance" system was new. Concerning the duration of the contract, Barry's argument before the district court reveals a lack of definiteness. Barry stated:

> Additionally, the parties agreed that the contract would be coterminous with the Teamster agreement. At the time of making the contract, the length of the Teamster agreement was unknown. The Teamsters could have agreed to a six month contract, making performance of the Ryerson/Barry agreement possible within one year.

At the time Barry submitted its formal contract to the Teamsters in February of 1998, the union still had not agreed to the wage plan that the proposed contract had been drafted upon. It was not until the end of February that the union formally accepted the pay for performance system. Thus, the essential terms and duration of the contract were uncertain at the time the proposed contract was allegedly entered into by Ryerson and Barry.

In sum, we hold that the district court did not err in concluding that although Ryerson and Barry had several discussions regarding a possible contract, the negotiations did not rise to the level of a formal contractual agreement.

## C. The Abuse of Discretion Claim

■ We next consider whether the district court's denial of injunctive relief for Barry was an abuse of discretion. In reviewing the denial of a preliminary injunction, this Court considers the district court's findings of fact for clear error, its balancing of factors for an abuse of discretion, and its legal conclusions *de novo*. *See Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997) (citation omitted). The question we must consider is not what this Court would have done in the first instance, but whether this Court has a strong conviction that the district court exceeded the permissible bounds of judgment. *See Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 594–95 (7th Cir.1986). By according substantial deference to the district court's decision, we recognize the advantage of the trial court's proximity to the evidence. *See Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437–38 (7th Cir.1986).

■ In considering whether to grant injunctive relief, the district court is obligated to weigh the relative strengths and weaknesses of the plaintiffs' claims in light of a five-part test that has long been part of this Circuit's jurisprudence. Specifically, Barry was required to establish: (1) that there was a reasonable or substantial likelihood that it would succeed on the merits; (2) that there was no adequate remedy at law; (3) that absent an injunction, Barry would suffer irreparable harm; (4) that the irreparable harm suffered by Barry in the absence of the injunctive relief would outweigh the irreparable harm that Ryerson would endure were the injunction granted; and (5) that the public interest was served by an injunction. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386–87 (7th Cir.1984). The district court considered these factors and ruled that the decision to grant an injunction in this case, as is often the circumstance, is driven by the likelihood of success on the merits.

■ As discussed earlier, we have determined that the district court's rulings regarding the joint-employer dispute and the contract claim were not clearly erroneous. Thus, Barry is unable to establish a likelihood of success on the merits regarding its joint-employer or contract claims.

Without demonstrating a reasonable likelihood of success on the merits of either claim, Barry failed to satisfy the all important first element of *Roland*, and we therefore need not consider the other four elements.

### IV. CONCLUSION

Because this case is analogous to the *Osco* decision, the district court did not err in concluding that Ryerson was not a joint-employer of the Teamsters drivers. Furthermore, the evidence in the record fails to demonstrate that a valid contract existed between Ryerson and Barry. Finally, the district court's denial of injunctive relief was not an abuse of discretion since Barry failed to demonstrate that it was likely to succeed on the merits of its case.

AFFIRMED.